E. Elwood **LEWIS** and James McDonald, Plaintiffs-Appellants-Appellees,

v.

**WALSTON & CO., INC.,** Defendant-Appellee,

Jackie DeCasenave, Defendant-Appellant.

No. 72–3535.

United States Court of Appeals, Fifth Circuit.

Nov. 23, 1973.

Michael Nachwalter, Miami, Fla., for plaintiffs-appellants.

Cromwell A. Anderson, Jr., Miami, Fla., for defendant-appellee.

Before WISDOM, GODBOLD and IN-GRAHAM, Circuit Judges.

WISDOM, Circuit Judge:

The plaintiffs, Elwood Lewis and James McDonald, brought this suit against Walston & Co., a brokerage firm, and its registered representative, Mrs. Jackie DeCasenave, to recover for losses they sustained on the purchase of unregistered securities. They sue under §§ 12(1) and 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(1)–(2) (1970), and under the Florida Blue Sky Law, Florida Statutes § 517.21.[1] After a jury verdict for $70,000 in favor of the plaintiffs against both defendants, the trial judge, 347 F.Supp. 995, granted judgment notwithstanding the verdict in Walston's favor, but refused to set aside the verdict against Mrs. DeCasenave. The plaintiffs appeal from the grant of judgment n. o. v. in favor of Walston, and Mrs. DeCasenave appeals from the denial of judgment in

1. Originally the plaintiffs also alleged, violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1970), and rule 10b–5 promulgated under that section, 17 C.F.R. § 240.10b–5 (1972). The trial judge directed verdicts against the plaintiffs on these counts of the complaint. The plaintiffs do not challenge the propriety of that action here.

her favor. We reverse the judgment for Walston, and affirm the judgment against Mrs. DeCasenave.

## I.

The two plaintiffs were both long-time customers of Walston's Fort Lauderdale office before the events leading up to this suit began. Mrs. DeCasenave had regularly serviced Lewis's account for about a year and McDonald's account for about three years. This suit concerns the plaintiffs' purchases of stock in Allied Automation, a company that until it went into receivership had been developing a machine for converting all forms of currency into money orders. Lewis purchased $50,000 worth of stock in this company in three different blocks between January and April 1969; McDonald purchased $20,000 in two different blocks between January and June 1969.

From November 1968 on Mrs. De-Casenave touted Allied Automation to the plaintiffs by telephone and whenever they came in to the Walston office on business. She told them about the company, and about its plan for developing the money changing machine; in the Walston offices she showed them pictures of the machine and literature on the company; she voiced optimistic opinions about the appreciation potential of the company's stock. In early December 1968, in the Walston offices, she introduced McDonald and Lewis to one F. N. ("Jim") James, an officer of Allied Automation. After that introduction, she continued to tout the stock as a "potential IBM". She told the plaintiffs that the company would go public at a price between $13.50 and $15 per share, but that they could then purchase the stock at the "ground floor" because a certain number of shares could be allocated to them at a price of $5 per share. She falsely stated that Walston would be "taking a position" in the stock.

On January 3, 1969, Mrs. DeCasenave arranged a meeting among Lewis, McDonald, James, and Ron Lucas, James's partner in a partnership called International Industries. Lucas, who was also an Allied Automation officer, had come to Fort Lauderdale from the company's headquarters in Alexandria, Virginia, apparently for the express purpose of arranging a deal with Lewis and McDonald. The four met first at the Walston office, then went to a nearby coffee shop where they met for at least one and a half hours negotiating their deal, and returned to the Walston offices, where they consummated the deal. On the morning of the meeting Mrs. De-Casenave had again told McDonald that Walston would be taking a position in Allied Automation. She also told him that Lucas would meet in the afternoon with Jim Gaff, Vice President and Manager of Walston's Fort Lauderdale office. Mrs. DeCasenave, in the presence of McDonald and Lewis, took James and Lucas into Gaff's office at Walston where they spent about 25 minutes with Gaff. In consummating the deal at the Walston office, Lewis gave Lucas and James his personal check for $10,000 for 2,000 shares of Allied Automation stock at $5 per share. In return, James and Lucas, in the name of their partnership, issued him a receipt and an "investment letter" covering the 2,000 shares. The "investment letter" stated that Lewis had purchased the shares for investment purposes only and not for distribution or resale. He received no stock certificates, either on January 3 or on any later date; his understanding was that stock certificates would be issued to him only when the company went public. Mrs. DeCasenave assured him that the "investment letter" was an ordinary letter of purchase of stock.

McDonald also agreed to buy Allied Automation stock at the January 3, 1969, meeting, but he did not have the cash available to give the partnership his personal check. He agreed to purchase 3,000 shares for $15,000. A few days after January 3, he delivered his check for $15,000 to the partnership's bank. McDonald, however, according to his own testimony, did not intend to hold all 3,000 shares for himself and he

did not pay for the stock entirely with his own funds. He testified that he bought only $5500 of that stock for himself; the rest he purchased for four of his relatives. This included 200 shares ($1,000 worth) for his father, Alex McDonald; 200 shares ($1,000) for his uncle, Peter McDonald; 1100 shares ($5,500) for William Johnston, an in-law of McDonald's; and 400 shares ($2,000) for Joe Gordon, the husband of Johnston's niece. McDonald got the money for these blocks of stock from the parties for whom he bought them, except that he appears to have purchased the stock he was to give his father with money borrowed for that purpose from Johnston. But, although he purchased the stock for his relatives with their money, the "investment letter" that Lucas-James partnership gave him in return for his $15,000 check—the only evidence of stock ownership given him or anyone else[2]—showed McDonald to be the purchaser of the entire 3,000 share block. McDonald testified that he intended to distribute the stock to his relatives on Allied Automation going public.

After the January 3. meeting, Mrs. DeCasenave continued to tout Allied Automation, and she kept Lewis and McDonald abreast of developments in the company. In March, she called Lewis, who was then vacationing in North Carolina, to tell him that an additional 1,000 shares of Allied Automation were available. When Lewis returned to Florida, he went to Mrs. DeCasenave's office at Walston; on March 17, he purchased the additional thousand-share block at Mrs. DeCasenave's desk. Later Mrs. DeCasenave again called him to tell him more stock was available; and Lewis bought his final block of shares—7,000 shares for $35,000—at a meeting at his home with James. Lewis testified that all the negotiations for this purchase were conducted in Mrs. DeCasenave's

Walston office. McDonald made his final purchase of 1,000 shares for $5,000 on June 19, 1969. This purchase, too, was made after Mrs. DeCasenave had called McDonald to tell him that an additional 1000 shares had been allocated to him at $5 a share; she advised him to take them, and he did.

Mrs. DeCasenave procured most of the purchase price for the plaintiffs by selling listed stocks out of their accounts at Walston and providing checks from the proceeds for the plaintiffs to use in purchasing stock in Allied Automation.

According to his own testimony, Gaff, the Vice President and Manager of the Fort Lauderdale office knew about Allied Automation and its plans for producing a money-changing machine; and he knew that Mrs. DeCasenave was interested in and was touting the stock. Gaff testified that he knew that Lewis was interested in the stock, but said that he did not recall whether Mrs. DeCasenave had ever told him of McDonald's interest in the stock. Gaff said that he had told Mrs. DeCasenave that she "ought to stick to her own business and run stocks instead of trying to talk about pies in the sky all the time". According to Lewis's testimony, Gaff also had advised him against purchasing the stock; Lewis said Gaff had told him that there were "too many listed stocks on the board to be investing in a company like this where there could be a margin of risk". But Gaff admitted that he had never ordered Mrs. DeCasenave to make an investigation of Allied Automation, that he never tried to get Mrs. DeCasenave to desist from her efforts to get the plaintiffs to buy the stock, and that he never sought to communicate to the plaintiffs that he did not want DeCasenave to get involved in deals in the stock.

Mrs. DeCasenave raises three issues on appeal. She contends (1) that the evidence was not sufficient to support

---

**2.** The receipt issued by the partnership for the $15,000 it received was made out jointly to McDonald and William Johnston. The receipt did not in any way constitute evidence of stock ownership; the only evidence of that was the investment letter issued entirely in McDonald's name.

the verdict against her and that the district court therefore erred in denying her motion for judgment n. o. v.; (2) that McDonald was not the "purchaser" of the stock bought in his relatives' behalf, and that he therefore does not have standing to recover for losses suffered from the purchase of that stock; and (3) that the district court erred in refusing to direct a verdict on the plaintiffs' claim under the Florida Blue Sky Law. The plaintiffs' appeal consists of an attack on the district court's action in setting aside their verdict against Walston. They argue that Walston could have been held liable under federal law on any of three different theories of liability, and that the evidence was sufficient to establish Walston's liability on any of the three grounds. They also argue that the evidence supported a verdict against Walston on the state law claim.

We take up Mrs. DeCasenave's appeal first.

## II.

■ Liability for the sale of unregistered securities is absolute under § 12(1) of the Securities Act of 1933.[3] A purchaser may recover regardless of whether he can show any degree of fault, negligent or intentional, on the seller's part. Liability is established if the plaintiff proves three elements: (1) that no registration statement covering the securities involved was in effect; (2) that, in the language of the statutes, the defendants were "person[s] who [sold] or offer[ed] to sell" the securities; (3) that the mails, or facilities for interstate transportation or communications were used in making the sale. In this case, since the parties stipulated that the first and third elements were present, the only question for the jury to decide was whether Mrs. DeCasenave "sold" the Allied Automation stock, within the meaning of § 12(1).

■ Mrs. DeCasenave of course was not a "seller" in the most common sense of that word, that is, she was not the party who parted with the securities sold and received the consideration given in exchange. That, however, is not conclusive under § 12(1), for the courts have recognized that other parties who participate in the negotiations of or arrangements for the sale of unregistered securities "sell" those securities within the meaning of § 12(1). See Cady v. Murphy, 1 Cir. 1940, 113 F.2d 988; 3 L.Loss, Securities Regulation at 1714–16 (2d ed. 1961). Brokers have long been held liable as sellers under § 12(2), as have other parties responsible for bringing about sales of securities they themselves do not own. Hill York Corp. v. American International Franchises, Inc., 5 Cir. 1971, 448 F.2d 680; Lennerth v. Mendenhall, N.D.O.1964, 234 F.Supp. 59. In *Hill York*, this Court announced the

3. Section 12(1) provides in full:
Any person who—
(1) offers or sells a security in violation of section 77e of this title [making it unlawful to use the mails or other facility of interstate commerce or transportation or communication to sell an unregistered security],
shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
77 U.S.C. § 77l(1) (1970). This case was submitted to the jury both under § 12(1) and under § 12(2), 77 U.S.C. § 77l(2) (1970). Section 77l(2) provides a civil remedy against a person who sells or offers to sell a security by means of a prospectus or oral communication containing a misrepresentation of or omission to state a material fact. On appeal, however, both the plaintiffs and Mrs. DeCasenave concentrated on the question of the sufficiency of the evidence to support liability under § 12(1). For this reason, our discussion is concerned exclusively with that question. Since we find that the evidence supported the verdict under a § 12(1) theory, it is unnecessary for us to consider whether it also could have supported a finding that she was liable under § 12(2).

test applied in this Circuit to determine whether a participant in the arrangements for a sale "sells" securities within the meaning of § 12(1). The test is whether the party is the "proximate cause" of the sale.

The first and principal ground Mrs. Casenave asserts for reversal of the judgment against her is that the evidence adduced at trial did not provide a substantial basis for concluding that she was the proximate cause of the sale of Allied Automation stock. We find this contention altogether untenable. Mrs. DeCasenave does not dispute the facts that she touted the Allied Automation stock heavily to the plaintiffs, arranged the January 3 meeting, and notified the plaintiffs that there was additional stock available before each of the plaintiffs' later purchases. The jury could permissibly infer from these facts that Mrs. DeCasenave's actions were a "substantial factor" in bringing about the plaintiffs' purchases, and thus the "proximate cause" of those purchases. Moreover, both plaintiffs testified that throughout their dealings in Allied Automation they had "relied on [their] broker"; and, although they are interested witnesses, the judgment of their credibility was for the jury. Viewing the evidence "in the light and with all reasonable inferences most favorable" to the plaintiffs, it is impossible to say that "the facts and inferences point so strongly and overwhelmingly" in Mrs. DeCasenave's favor that reasonable men could not have found for the plaintiffs. Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365, 374. The district court therefore properly denied Mrs. DeCasenave's motion for judgment notwithstanding the verdict.

Mrs. DeCasenave's second ground concerns only the $9500 worth of stock McDonald purchased with his relatives' money. Mrs. DeCasenave's position is that only the relatives, and not McDonald, had standing to recover for losses on this stock. She notes that §

12(1) grants a right of recovery against a seller only to "the person purchasing such security from him",[4] and she suggests that McDonald's recovery here subjects her to a risk of double liability.

We cannot accept this contention, for it seems to us that the record compels the conclusion that McDonald was recognized as the "purchaser" of this stock. To be sure, the record does indicate that the money for the purchases was supplied by his relatives and that McDonald *intended*, on the stock's going public, to distribute shares to his relatives proportionate to the amounts they had paid. But the key fact is that the stock purchased with the relatives' money was purchased in McDonald's name and as far as the parties were concerned, he was, for all intents and purposes, the owner of the stock. McDonald, like Lewis, was never issued certificates on the Allied Automation stock he bought; the only document evidencing his ownership was the letter of investment intent, and that letter showed McDonald as the sole purchaser of the entire block of shares.[5] All those involved recognized that McDonald was the purchaser of the entire block of shares and would retain title until some then undetermined future date. On this state of the record, we can only conclude that McDonald was entitled to sue on the entire block of shares; and that the relatives would *not* have been entitled to sue the defendants in their own names prior to the Allied Automation's going public. McDonald's recovery was therefore appropriate; since the relatives did not have the right to sue, Mrs. DeCasenave was not subject to any risk of double liability.

Mrs. DeCasenave's third ground concerns the propriety of the plaintiffs' recovery under the Florida Blue Sky law. Our holding on her first two grounds establishes her liability for the full amount of the plaintiffs' losses under federal law and makes it unnecessary for us to consider this question.

---

**4.** See note 3 *supra*.

**5.** See note 2, *supra*.

## III.

The plaintiffs attack the award of judgment n. o. v. in Walston's favor by arguing that the evidence was sufficient to support a verdict against Walston on any one of three theories. They contend that the evidence supports (1) the conclusion that Walston itself proximately caused the sale of stock to the plaintiffs, and thus was a "seller" of the securities within the meaning of the *Hill York* case; (2) the conclusion that in taking the actions the jury found proximately caused the sale, Mrs. De-Casenave was clothed with apparent authority from Walston; and (3) that in taking those actions, Mrs. DeCasenave was acting within the line and scope of her employment. We do not address the first two of these contentions, because we find that the evidence supported a verdict against Walston on the third theory, and that the award of judgment n. o. v. in Walston's favor must therefore be reversed.

The American Law Institute's Restatement (Second) of Agency describes what is meant by the term "within the scope of employment" in the following manner:

(1) To be within the scope of employment conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.

(2) In determining whether or not the conduct, although not authorized, is nevertheless so similar or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:

(a) whether or not the act is one commonly done by such servants;

(b) the time, place and purpose of the act;

(c) the previous relations between the master and servant;

\* \* \* \* \* \*

(f) whether or not the master has reason to expect that such an act will be done;

(g) the similarity in quality of the act done to the act authorized;

(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

(i) the extent of departure from the normal method of accomplishing an authorized result; and

(j) whether or not the act is seriously criminal.

American Law Institute, Restatement (2d) of Agency § 229. Accepting this section as setting forth the relevant principles, we think it clear that there was an evidentiary basis for finding that Mrs. DeCasenave was acting within the scope of her employment in taking the actions the jury found constituted the proximate cause of the plaintiffs' purchases. Those actions included touting a stock, making recommendations, keeping customers informed of developments in a company whose securities the customers were considering buying, and arranging the mechanics of a purchase-and-sale transaction. These are "acts commonly done" by brokers, within the meaning of § 229(2)(a); at the very least, they would be "simila[r] in quality" to acts brokers are routinely authorized to perform. Mrs. DeCasenave used the Walston offices regularly in arranging the transaction; and she used her position as the representative who serviced McDonald's and Lewis's accounts to recruit them as purchasers of this new company's stock. Thus, to this extent, the "instrumentality by which the harm [was] done [was] furnished by the master to the servant", within the meaning of § 229(2)(h).

Walston argues that Mrs. DeCasenave was acting beyond the scope of her employment. For example, Walston did not deal in unregistered securities. Moreover, Mrs. DeCasenave and the brokerage house did not perform their usual roles as brokers; that is, the transaction did not involve the broker's placing an order through the house's New York office, which was then executed by the central office. In this regard, they note

that Walston never stood to receive, and never did receive, any commission or other financial benefit from the direct and essentially private exchange Mrs. DeCasenave arranged. In addition, Walston points to Gaff's testimony that he advised Mrs. DeCasenave against dealing in the stock, and to Lewis's testimony that Gaff advised him to the same effect.

■ None of these superficially supportive bases for Walston's argument precludes the conclusion that Mrs. DeCasenave's actions were within the scope of her employment. That Walston did not deal in unregistered securities addresses only the question whether Mrs. DeCasenave's conduct was authorized; as our discussion above and the quotation from the Restatement indicate, however, conduct may be within the scope of employment even if it is unauthorized, if it is sufficiently similar to authorized conduct. That the transactions did not involve the execution of an order through the brokerage house also does not necessarily mean that Mrs. DeCasenave's acts were without the scope of her employment. Brokers may and do take many actions in the course of their dealings with customers that do not relate directly to transactions executed through the brokerage house; these actions are not for that reason necessarily beyond the scope of the brokers' employment. That Walston did not receive any financial benefit from the transaction is not of controlling importance. If a particular act is authorized, or sufficiently similar to an authorized act, finding that act to be within the scope of employment does not require that the act have conferred any particular benefit, financial or otherwise, on the employer.

Finally, Gaff's testimony that he advised Mrs. DeCasenave against continuing to hawk Allied Automation does not preclude a finding that Mrs. DeCasenave acted within the scope of her employment. In the first place, the precise wording of Gaff's admonition makes it clear that his words were intended not as an instruction given in his official ca-

pacity, but rather as personal counsel to Mrs. DeCasenave. He told her that she should "stick to her own business and run stocks instead of trying to talk about pies in the sky all the time", and that "[f]or every deal that you try to put together on an underwriting or a new issue of something like that, you might work for years before you get one deal". It was to Jackie DeCasenave's personal interest, not the interests of Walston & Co., that Gaff appealed. Second, Gaff, in spite of his position as manager of the office, did nothing beyond issuing this scarcely forbidding warning to Mrs. DeCasenave. Gaff's advice to Lewis also fails to defeat the possibility that Mrs. DeCasenave was acting within the scope of her employment. That too was only investment advice: Gaff told Lewis there were too many listed stocks for him to be investing where there was a "margin of risk". Such advice conveyed no meaning that Mrs. DeCasenave was acting outside the scope of her authority in promoting Allied Automation.

Thus we find that there was evidence to support the jury's conclusion that Mrs. DeCasenave was acting within the scope of her employment. The district court's grant of judgment n. o. v. must therefore be reversed.

Our holding makes it unnecessary for us to consider the contentions advanced by the plaintiffs that the evidence supported Walston's liability on either of two other theories. In addition, since our holding establishes Walston's liability under federal law for the full amount of the plaintiffs' loss, it is unnecessary for us to consider the second issue raised by the plaintiffs, that the evidence was sufficient to support a jury verdict against Walston under Florida law.

The judgment in favor of the plaintiffs against Mrs. DeCasenave is affirmed. The judgment in favor of Walston & Company is reversed and the case is remanded to the district court to enter a judgment for the plaintiffs against Walston & Company in favor of the plaintiffs.