PAUL F. NEWTON & COMPANY and
Daniel O'Connell, Receiver,
Plaintiffs–Appellants,

v.

TEXAS COMMERCE BANK et
al., Defendants,

Pressman, Frohlic & Frost,
Defendants–Appellees.

No. 79–1379.

United States Court of Appeals,
Fifth Circuit.

Nov. 21, 1980.
Rehearing and Rehearing En Banc
Denied Dec. 24, 1980.

Sidney Ravkind, Terrell W. Oxford, Houston, Tex., for plaintiffs–appellants.

Butler, Binion, Rice, Cook & Knapp, Norman J. Riedmueller, Tom Alexander, Houston, Tex., for defendants–appellees.

Before AINSWORTH, CHARLES CLARK and TJOFLAT, Circuit Judges.

CHARLES CLARK, Circuit Judge:

Paul F. Newton & Company [Newton] appeals from the district court's grant of a directed verdict to Pressman, Frohlich & Frost, Inc. [Pressman] in its action against Pressman predicated upon alleged violations of the Securities and Exchange Commission's Rule 10b–5, 17 C.F.R. § 240.10b–5 (1979), by one of its employees, and upon common law fraud. Following the presentation of evidence by the parties, the district court granted Pressman's motion for a directed verdict, reasoning that the only basis for imposing liability upon Pressman shown by the evidence presented was the doctrine of respondeat superior, which it concluded did not apply to actions brought under the federal securities act. We reverse and remand for a new trial.

I. Facts [1]

This action arises out of an allegedly fraudulent scheme to inflate the price of the stock of the Imperial Investment Company [Imperial], which stock was traded in the over–the–counter market. Newton alleged that several individuals, after acquir-

---

1. The district court made no findings of fact in granting the directed verdict to Pressman at the close of the parties' presentation of evidence. The factual summary included in this opinion is drawn primarily from the allegations of the parties and our examination of the rec- ord below. We express no opinion as to whether these allegations are supported by the evidence presented. The summary is made merely to establish the context within which we decide the legal issues raised by this appeal.

ing control of all the tradeable shares of Imperial stock, conspired to create an active market for the stock in which they could profit from their acquisition.

A sale of an over–the–counter stock, such as the Imperial stock, typically involves five parties: the seller, the selling broker, the market maker, the buying broker, and the buyer. The market maker acts as a middleman between the selling broker and the buying broker, who represent the seller and buyer respectively. A firm that is willing to act as a market maker for a particular over–the–counter stock indicates that willingness to buying and selling brokers by listing itself in the "pink sheets," which are daily publications that list almost every stock traded in the over–the–counter market, the names of those firms maintaining a market in a particular stock, and a stated price at which each firm is willing either to buy or sell the security.

The conspirators devised a scheme whereby they could inflate the price at which Imperial stock was traded by using their control over all of the tradeable shares of the stock. They solicited several persons employed by brokerage firms to assist the scheme by acting as either selling brokers or market makers. Several other persons joined the scheme to pose as buyers of the stock. The essence of the scheme was that by controlling both the buyer and seller in each transaction involving Imperial stock, the conspirators could control the price at which the stock was traded and artificially raise that price over a series of transactions.

The conspirators allegedly acquired the services of Stanleigh Bader, a registered representative of Pressman, to act as a market maker. In return for a promise of a guaranteed profit, he agreed to enter Pressman's name in the pink sheets as a market maker in Imperial stock. The conspirators promised Bader that if he purchased more shares of Imperial stock than he could sell, they would provide a buyer for the stock who would purchase it at a price above that at which Bader bought it. Similarly, if Bader contracted to sell more Imperial stock than he possessed, they would arrange for him to buy the stock he needed at a price below that for which he had contracted to sell the stock. In return for this guarantee of a profit on every transaction, Bader was to perform the essential service to the scheme of increasing with each transaction the price he quoted to persons seeking to trade in Imperial stock.

Buyers working for the conspirators would contact brokerage firms seeking to purchase Imperial stock. They would place purchase orders with the brokers and arrange to pay upon delivery of the stock certificates. Under this arrangement, the buying broker would purchase the shares and then transmit the stock certificates to a bank designated by the buyer together with an attached draft for the amount owed to it by the buyer. The buyer would have his bank honor the draft and take possession of the shares. The buying brokers would ascertain from the pink sheets the name of brokerage firms willing to act as market makers. When contacted by the buying brokers, the market makers would quote a price for the Imperial stock, raising the quoted price with each transaction, and would contract to sell the stock to the buying broker. Selling brokers representing the conspirators would provide the stock to the market maker to satisfy their contracts.

In December 1969, Newton, whose principal place of business is in Houston, Texas, received purchase orders for Imperial stock from several individuals in New York who it alleges were part of the conspiracy. Although Newton had previously dealt with out–of–town customers on a cash–only basis, it agreed to make these purchases on a "payment–against–delivery" basis, under which arrangement Newton would purchase the stock itself and then seek payment from the buyers. To fill these New York buyers' purchase orders Newton contracted to buy more than 49,000 shares of Imperial stock. It paid over $515,000 to various market makers before it discovered that its buyers were not going to pay for the stock, at which time it refused to pay for any more of the stock it had contracted to purchase. Newton paid almost $220,000 to Pressman

for Imperial stock and refused to pay for another $170,000 of stock that it had ordered. Newton ultimately received payment from its buyers for only five hundred of the shares of Imperial stock it purchased, and when the stock's price collapsed after the discovery of the fraudulent scheme, Newton went into bankruptcy.

In 1970, Newton initiated this action against Pressman and several other brokerage firms and individuals allegedly involved in the conspiracy to inflate the price of Imperial stock, alleging violations of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Texas common law of fraud. By the time the suit finally went to trial in May 1978, Pressman was the only defendant who had not defaulted, settled, or been dismissed. Newton alleged that Pressman's employee Stanleigh Bader, was involved in the conspiracy to manipulate the price of Imperial stock. It contended that the conspirators had violated § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b); § 17 of the Securities Act, 15 U.S.C. § 77q; Rule 15c2–7 of the Securities and Exchange Commission [SEC], 17 C.F.R. § 240.15c2–7 (1979); and the Texas common law doctrine of fraud.[2] Newton sought to impose liability upon Pressman for the acts of its employee under the doctrine of respondeat superior and § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a).

On the sixth day of the jury trial, following the close of the presentation of evidence, the district court granted a directed verdict to Pressman, ruling that the doctrine of respondeat superior could not be used as a basis for liability for a violation of the Securities Exchange Act and that Pressman could not be held liable under § 20(a) because it had neither participated in nor had knowledge of the fraudulent acts of its employee.

On this appeal Newton contends that the district court erred in several respects. First, it argues that § 20(a) is not the exclusive means by which secondary liability may be imposed under the Securities Exchange Act and does not exclude the application of common law agency principles such as respondeat superior. Second, it asserts that it was entitled to a directed verdict holding Pressman liable under the respondeat superior doctrine. Finally, it urges that Pressman was not entitled to a directed verdict on its claim under § 20(a) since material questions of fact existed as to whether Pressman had established its entitlement to the good faith defense incorporated by Congress into § 20(a).

Pressman responds that the district court properly concluded that liability for a violation of the Securities Exchange Act could not be predicated upon respondeat superior. It contends that it was entitled to a directed verdict under § 20(a) since it established as a matter of law that it had not participated in or known of the fraudulent acts of its employee and had met its duty to supervise its employee's activities. It also urged that the directed verdict could be upheld on the ground that the evidence showed that Newton had failed to act with "due diligence." Finally, it argued that the evidence presented against it by Pressman consisted largely of inadmissible hearsay statements that the district court should have excluded.

## II. The Viability of Agency Principles in Federal Securities Actions

Newton urges that the district court erroneously concluded that Pressman could not be held liable under the doctrine of respondeat superior for the alleged violations of

---

**2.** Decisions by the Texas courts have indicated that a corporation may be held liable for the fraudulent acts of its officers or directors under common law agency principles. *See American Bank & Trust Co. v. Freeman*, 560 S.W.2d 444 (Tex.Civ.App.1977) (bank not liable for alleged fraudulent acts of the chairman of its board of directors where he was not acting in the scope of his authority, either actual or apparent); *R. O. McDonnell Development Co. v. Schlueter*,

339 S.W.2d 701 (Tex.Civ.App.1960) (writ ref., n. r. e) (court affirms imposition of liability upon corporation for fraudulent acts committed by its president). On this appeal neither Newton nor Pressman has addressed the issue of whether the district court erred in granting a directed verdict to Pressman on Newton's common law fraud claim. Therefore we pretermit that issue.

the Securities Exchange Act of 1934 committed by its employee. Such a result, it argues, contravenes prior decisions by this court, is contrary to the view adopted by a majority of other circuits deciding the issue, and conflicts with the remedial purpose of the Act and with Congress's intent in enacting § 20(a). Pressman responds that Congress intended § 20(a) to be the exclusive means by which secondary liability could be imposed for violations of the Act, thereby supplanting common law agency principles, and that a majority of those circuit courts addressing the issue has concluded that § 20(a) preempts common law agency principles.

### A. The Controlling Persons Provisions and Their Legislative History

Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a), provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Congress modeled § 20(a) upon § 15 of the Securities Act of 1933, 15 U.S.C. § 77o, which reads:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

In *Pharo v. Smith*, 621 F.2d 656, 673–674 (5th Cir. 1980), this court concluded that § 15 of the Securities Act and § 20(a) of the Securities Exchange Act are analogous provisions that should be interpreted similarly.

Congress enacted § 15 to prevent persons from evading liability for violations of the registration requirements of the Securities Act by employing others to act in their stead. *See SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir. 1975); S.Rep. No. 47, 73d Cong., 1st Sess. 5 (1933); H.R. Conf.Rep. No. 152, 73d Cong., 1st Sess. 27 (1933). The initial draft of the Securities Act prepared by the Senate proposed an "insurer's liability" standard, under which any officer or director of a corporation would be liable for violations committed by it regardless of his personal fault. S.Rep. No. 47, 73d Cong., 1st Sess. 5 (1933). *See also Rochez Brothers v. Rhoades*, 527 F.2d 880, 885 (3d Cir. 1975). The draft bill promulgated by the House of Representatives, however, predicated such secondary liability upon a "fiduciary standard," which imposed liability upon only those controlling persons who breached a duty of due care. H.R.Rep. No. 85, 73d Cong., 1st Sess. 5 (1933), H.R. Conf.Rep. No. 152, 73d Cong., 1st Sess. 27 (1933). A conference committee adopted the House version. *Id.*

Thus Congress's specific purpose in enacting § 15 was to impose liability upon persons who controlled corporations committing violations of the Securities Act but who might attempt to evade liability under common law principles by utilizing "dummies" that would act in their place and under their control. The legislative history of § 15 does not indicate whether Congress by enacting § 15 intended to supplant common law agency principles for determining secondary liability or simply to expand the group of persons secondarily liable for violations of the Securities Act by imposing liability on certain "controlling persons," who might not be liable under common law principles.

The legislative history of § 20(a) discloses that Congress deliberately patterned it after § 15, with the identical purpose of pre-

venting persons from avoiding liability under the provisions of the Securities Exchange Act by utilizing "dummies" to commit the prohibited acts. *See SEC v. Management Dynamics, Inc.*, 515 F.2d at 812; Hearings before the Senate Comm. on Banking and Currency on S.Res. 84 (72d Cong.) and S.Res. 56 and 97 (73d Cong.), 73d Cong., 1st Sess., pt. 15, at 6571 (1934). When enacting the Securities Exchange Act, Congress also amended § 15 to provide a defense, similar to that included in the newly enacted § 20(a), to those controlling persons who in good faith exercise due care to avoid violations by the controlled person of the Securities Act. Section 20(a) excluded from liability those controlling persons who established that they had "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action," *see* 15 U.S.C. § 78t(a), whereas § 15 excluded those persons who "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist," *see* 15 U.S.C. § 77*o*. These good faith defenses merely made explicit Congress's intention of imposing liability under the controlling persons provisions only on the basis of a failure to exercise due care. The inconclusive legislative history of §§ 15 and 20(a) supports neither of the positions advocated by the parties before us on this appeal. We look next for guidance to the case law dealing with the two securities acts.

### B. Prior Fifth Circuit Decisions

Newton relies upon *Lewis v. Walston & Co.*, 487 F.2d 617 (5th Cir. 1973), to support its argument that this court has previously determined that the federal securities acts do not preclude the imposition of secondary liability on the basis of agency principles, such as the doctrine of respondeat superior. In *Lewis* the court addressed the potential liability of a brokerage firm for a violation of § 12(1) of the Securities Act of 1933, 15 U.S.C. § 77*l*(1), by one of its registered representatives. It affirmed the judgment entered against the registered representative based upon her selling of unregistered securities in violation of § 12(1), but it reversed the district court's grant of a judgment notwithstanding the verdict to the brokerage firm. The court found that the evidence presented sufficiently demonstrated that the registered representative had been acting within the course and scope of her employment to support the verdict rendered by the jury against the firm. *Lewis v. Walston & Co.*, 487 F.2d at 621–24. While the court clearly utilized agency principles to impose liability upon the brokerage firm for the acts of its employee, it did not decide, nor apparently did the parties raise, the issue whether § 15 of the Securities Act, 77 U.S.C. § 77*o*, was the exclusive means by which secondary liability could be imposed upon the brokerage firm for the acts of its employee. We are unwilling to read *Lewis* as deciding by implication the question before us on this appeal.[3]

### C. Decisions by Other Circuits

Other circuits that have clearly addressed the question have reached differing conclusions concerning the viability of the respondeat superior doctrine in an action brought under the federal securities acts. The Second, Fourth, Sixth, and Seventh Circuits have held that the controlling person provisions are not the exclusive methods by which secondary liability may be imposed under the securities acts, while the Third and Ninth Circuits have reached the oppo-

---

**3.** In *Woodward v. Metro Bank of Dallas*, 522 F.2d 84 (5th Cir. 1975), the issue confronting the court was whether the defendant bank could be held liable for aiding and abetting a violation of Rule 10b–5. The court acknowledged that the Second Circuit at that time had apparently adopted the view that § 20(a) was the exclusive means by which a defendant could be held secondarily liable for a violation of the Securities Exchange Act. *See Gordon v. Burr*, 366 F.Supp. 156 (S.D.N.Y.1973), *aff'd in* part, *rev'd in part*, 506 F.2d 1080 (2d Cir. 1974). Although it characterized that view as "an unnecessarily restrictive approach to the securities acts," the court in *Woodward* pretermitted the question whether § 20(a) was the exclusive means by which secondary liability could be imposed because it concluded that the plaintiff had failed to show that the defendant bank had aided and abetted the violation of Rule 10b–5. *Woodward v. Metro Bank of Dallas*, 522 F.2d at 94 n. 22.

site conclusions. *Compare Marbury Management, Inc. v. Kohn*, 629 F.2d 705, Fed. Sec.L.Rep. (CCH) ¶ 97,357 (2d Cir. 1980);[4] *Holloway v. Howerdd*, 536 F.2d 690 (6th Cir. 1976); *Fey v. Walston & Co.*, 493 F.2d 1036 (7th Cir. 1974); *Johns Hopkins University v. Hutton*, 422 F.2d 1124 (4th Cir. 1970), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974); *with Rochez Brothers v. Rhoades*, 527 F.2d 880 (3d Cir. 1975); *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975).[5] *See also Reyos v. United States*, 431 F.2d 1337 (10th Cir. 1970), *aff'd in part and rev'd in part sub nom., Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *Myzel v. Fields*, 386 F.2d 718 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968).

In *Rochez Brothers v. Rhoades*, 527 F.2d at 884–86, the Third Circuit, after examining the legislative history of §§ 15 and 20(a), determined that Congress intended to restrict secondary liability to those controlling persons who were culpable participants in the acts constituting the violation of the securities acts. It reasoned that such a conclusion was consistent with the general tenor of the securities acts, which impose liability only after a showing of culpability. *Id.* at 885. To allow the application of the doctrine of respondeat superior in a securities action would, the Third Circuit reasoned, circumvent congressional intent by emasculating the good faith defense incorporated into § 20(a). The question before the Third Circuit was whether the Securities Exchange Act imposed liability upon a corporation for the acts of its chief executive officer and fifty percent stockholder that violated Rule 10b–5 when he acted entirely on his own behalf and his fraudulent acts did not benefit the corporation. The court hypothesized that to apply the doctrine of respondeat superior under such circumstances would inflict primary liability upon a corporation for any violation of the securities laws committed by its officers or employees. *Id.*

Those circuits that have applied the doctrine of respondeat superior in actions brought under the federal securities acts have also focused upon the congressional intent underlying the enactment of the controlling persons provisions, the general policies promoted by the securities acts, and the resulting effect of imposing such secondary liability. Those courts have concluded that by enacting § 15 of the Securities Act and § 20(a) of the Securities Exchange Act,

**4.** Prior to the Second Circuit's decision in *Marbury*, which clearly held that respondeat superior principles applied in actions brought under the securities acts, the position adopted by the Second Circuit was unclear. *Compare SEC v. Geon Industries, Inc.*, 531 F.2d 39 (2d Cir. 1976) (injunction will not be imposed in an SEC enforcement action upon defendant brokerage firm for acts of its registered representative on the basis of respondeat superior), *with SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975) (SEC entitled to an injunction in an enforcement action against the defendant company for acts of its employee who utilized his apparent authority as vice president in charge of trading to commit the fraudulent acts).

**5.** While the Ninth Circuit has held that agency principles are inapplicable in actions predicated upon the securities acts, *see Christoffel v. E. F. Hutton & Co.*, 588 F.2d 665 (9th Cir. 1978); *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975), the court has never directly addressed the question. Those Ninth Circuit decisions holding that agency principles do not apply have relied primarily upon the court's prior decision in *Kamen & Co. v. Paul H. Aschkar & Co.*, 382 F.2d 689 (9th Cir. 1967), *cert. dismissed*, 393 U.S. 801, 88 S.Ct. 40, 21 L.Ed.2d 85 (1968). In *Kamen*, however, the court did not address the issue. Instead, the court ruled the plaintiff investor was not entitled to recover under a theory of common law fraud because it found that the defendant's employee had no ostensible authority to act on behalf of his employer upon which the plaintiff could have relied. *Id.* at 694-96. The court then examined the plaintiff's claims brought under the 1933 and 1934 securities acts and ruled that the defendant employer could not be held liable under either § 15 or § 20(a). *Id.* at 697. Because of its ruling that the defendant's employee acted without actual or apparent authority, the court did not have to determine whether the defendant employer could be held liable under agency principles for the violations of the securities acts committed by its employee, and the court's opinion does not indicate whether it considered the issue.

Congress intended to extend the coverage of the acts to encompass persons who exercised effective control over persons directly liable for violations of the acts and upon whom agency law or other common law principles would not impose liability. *See Marbury Management, Inc. v. Kohn*, 629 F.2d 705, [1980] Fed.Sec.L.Rep. ¶ 97,357 at ¶ 97,405; *Holloway v. Howerdd*, 536 F.2d at 694–95; *SEC v. Management Dynamics, Inc.*, 515 F.2d at 812–13. To limit secondary liability for violations of the securities acts to the situations encompassed by §§ 15 and 20(a) in the employer–employee context, they reasoned, would allow an employer who would otherwise be responsible for the acts of its employees to escape liability merely by showing that it acted in good faith and neither had knowledge of nor participated in the unlawful acts. Observing the pervasive application of agency principles elsewhere in the law, the Second Circuit stated in *SEC v. Management Dynamics* that it would find those principles to be inapplicable to securities actions only upon a demonstration that Congress clearly intended to exclude their application. 515 F.2d at 812. The Second Circuit also observed that by including corporations within the meaning of "person" in the definitional sections of the acts, 15 U.S.C. §§ 77b, 78c(a)(9), Congress intended that corporations fall within the acts' reach, which necessitates the use of agency principles since a corporation can act only through its agents. The court then reasoned that "[w]ere §§ 15 and 20(a) the sole measures of corporate liability, . . . the inclusion of corporations under the definitions of 'person' would be not only unnecessary but also misleading." *SEC v. Management Dynamics, Inc.*, 515 F.2d at 812. In *Marbury Management, Inc. v. Kohn*, the Second Circuit found further support for the application of agency principles in § 28(a) of the Securities Exchange Act, 15 U.S.C. § 78bb(a), which provides that the rights and remedies created by the Securities Exchange Act did not displace, but were in addition to, all other rights and remedies that might exist at law or in equity. 629 F.2d at 716, [1980] Fed. Sec.L.Rep. ¶ 97,357 at ¶ 97,405.

### D. Our Conclusion

 After analyzing the legislative history of §§ 15 and 20(a), the conflicting decisions from other circuits, and the policy considerations underlying those decisions, we conclude that common law agency principles, including the doctrine of respondeat superior, remain viable in actions brought under the Securities Exchange Act and provide a means of imposing secondary liability for violations of the Act independent of § 20(a). The federal securities statutes are remedial legislation and must be construed broadly, not technically and restrictively. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741, 760 (1972); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195, 84 S.Ct. 275, 285, 11 L.Ed.2d 237, 248 (1963). The legislative history of §§ 15 and 20(a) demonstrates that Congress enacted those sections to address the specific evil of persons seeking to evade liability under the acts by organizing "dummies," that, acting under their control, would commit the prohibited acts. That history does not reflect any congressional intent to restrict secondary liability for violations of the acts to the controlled persons formula set out in §§ 15 and 20(a). Section 28 of the Securities Exchange Act, by expressly making the rights and liabilities imposed by the Act cumulative of any existing at law or in equity, evinces a contrary congressional intent.

Limiting secondary liability under the 1934 Act to that liability provided by § 20(a) would contradict the pervasive application of agency principles in nearly all other areas of the law. In the specific factual context confronting us, which concerns the liability of a brokerage firm for the acts of its registered representative, such a rule would enable the brokerage firm to escape liability under the reasoning of some circuits merely by showing that it did not "culpably participate" in fraud committed by its employee. *See, e. g., Rochez Brothers v. Rhoades*, 527 F.2d at 889–91. To allow a brokerage firm to avoid secondary liability simply by showing ignorance,

purposeful or negligent, of the acts of its registered representative contravenes Congress's intent to protect the public, particularly unsophisticated investors, from fraudulent practices. At least with respect to the initial choice of a broker, most investors rely upon the reputation and prestige of the brokerage firm rather than the individual employees with whom they might deal. Such firms should be held accountable if employees they select utilize the firm's prestige to practice fraud upon the investing public.

The Third Circuit's rule in *Rochez Brothers*, and the reasoning underlying it, could produce unfair results depending upon the nature of the brokerage firm with which the aggrieved investor dealt. For example, the Third Circuit would impose liability upon a corporate firm whose officer or employee commits violations of the securities acts while acting "(1) in the course of his employment, and (2) for the benefit of the corporation." *Id.* at 884. Yet the Third Circuit rule appears to reject a finding of liability where all the facts are the same except that the violations were committed by an employee of a partnership. In the absence of any clear expression of Congress's intent, we decline to construe § 20(a) in such a manner.

To utilize common law agency principles to determine secondary liability for violations of the securities acts does not expose corporations, employers, and other such potential defendants to strict liability for all acts of their agents or cause them to become insurers of their agent's actions. The familiar requirements of agency that the agent act within the course and scope of his employment and that he act within his actual or apparent authority serve to restrict the scope of the principal's liability. It is consistent with the remedial purpose of the federal securities acts to require a brokerage firm that provides an employee with the means to carry out fraudulent practices to pay damages to a victim of those practices when the employee it has chosen acts within the course and scope of his employment.

Thus we conclude that § 20(a) does not supplant or exclude the application of common law principles of agency, in particular the doctrine of respondeat superior, in an action brought under the Securities Exchange Act. The district court erred in granting a directed verdict to Pressman, and we reverse and remand for a new trial.

Both Newton and Pressman contend on this appeal that they are entitled to a directed verdict on the question whether Bader acted within the course and scope of his employment with Pressman while he was engaged in the allegedly fraudulent activities. The evidence presented by the parties presents a close factual question that cannot be decided as a matter of law. This issue will have to be determined by the finder of fact on retrial.

### III. Pressman's Liability under Section 20(a)

In its memorandum opinion the district court ruled that Newton had failed to present any evidence showing "that [Pressman] furthered or even knew of Bader's activities or that any of its officers, employees or agents participated in the securities fraud." This essentially constitutes a finding that as a matter of law Pressman had satisfied the requisites for the good faith defense incorporated in § 20(a). Newton contends that this finding was erroneous, the district court applied an incorrect standard in deciding whether Pressman acted in good faith, and the issue should have been submitted to the jury because the evidence reflected a clear failure on Pressman's part to supervise adequately Bader's activities. Pressman responds that Newton failed to show that it was a culpable participant in or had any knowledge of the fraud. It contends that it presented sufficient evidence about its supervision of Bader's activities to warrant a directed verdict under the good faith defense provided by § 20(a).

To warrant a finding of liability under § 20(a) a plaintiff must show that the defendant controls a person upon whom liability could be imposed for a violation of the Securities Exchange Act. The SEC has defined the term "control" to mean: "the

possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405(f) (1979). Pressman does not contend it did not control Bader's activities while he was employed as its registered representative.

The evidence presented by Newton, at a minimum, sufficiently established Pressman's control over Bader to warrant submission of the issue to the jury. Whether Bader had committed a violation of the Securities Exchange Act for which he might be liable was a question not expressly decided by the district court. The court, however, did state "[t]here was ample evidence that there was a conspiracy to manipulate the market in Imperial Investment Company Stock, and that Stanleigh Bader, an employee of Defendant Pressman, Frohlic & Frost, was a member of such conspiracy."

 The correctness of the district court's grant of a directed verdict to Pressman on Newton's § 20(a) claim therefore depends upon whether it correctly found as a matter of law that Pressman had acted in good faith. The burden of establishing this defense to § 20(a) liability rested upon Pressman. *See Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 695 n.22 (5th Cir. 1971). Under the prior decisions of this circuit, a showing that Pressman, as a controlling person, "failed to establish, maintain, or diligently enforce a proper system of supervision and control" of activities of Bader, the controlled person, would suffice to show its lack of good faith. *See Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187, 194–95 (5th Cir. 1979), *modified on rehearing*, 611 F.2d 105 (5th Cir. 1980); *DelPorte v. Shearson, Hammill & Co.*, 548 F.2d 1149, 1154 (5th Cir. 1977). Thus the district court's finding that Pressman neither participated in nor had knowledge of the fraudulent activities of its employees was insufficient to warrant the grant of a directed verdict to it on Newton's § 20(a)

claim in the absence of evidence establishing as a matter of law that Pressman adequately supervised Bader's activities. While Pressman did present evidence concerning its supervision of Bader's activities, this evidence is not sufficient to establish as a matter of law that Pressman "diligently enforce[d] a proper system of supervision and control." We also reverse the grant of a directed verdict to Pressman on Newton's § 20(a) claim.

## IV. Statements by Coconspirators

Pressman asserts that the district court's grant of a directed verdict to it should be upheld on the ground that the evidence presented by Newton to establish that its employee, Stanleigh Bader, had violated the Securities Exchange Act consisted almost entirely of hearsay testimony concerning statements made by Bader's alleged coconspirators. This testimony, Pressman urges, was inadmissible as hearsay because Newton failed to present evidence independent of the hearsay statements establishing that a conspiracy existed, that it was a member of the conspiracy, and that the statements were made during the course of and in furtherance of the conspiracy. *See United States v. James*, 590 F.2d 575, 578 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); Fed.R. Evid. 801(d)(2)(E).

Fed.R.Evid. 801(d)(2)(E) excludes from the definition of "hearsay" a statement that "is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." In *United States v. James*, the en banc court interpreted Rule 801(d)(2)(E) to remove a statement made by a coconspirator from the application of the hearsay rule if the party seeking to introduce the statement has established by a preponderance of the evidence independent of the statement itself that (1) a conspiracy existed, (2) the declarant and the party against whom the statement is offered were members of the conspiracy, and (3) the declarant made the statement during the course and in furtherance of the conspiracy. 590 F.2d

at 582. The court then outlined the procedures by which the district court should make the threshold determination of the statement's admissibility and the standard to be applied in making that determination. *Id.* at 577–82.

Although *James* involved a criminal proceeding, as have the overwhelming majority of cases involving the admissibility of coconspirators' statements, the court's construction of the requirements of Rule 801(d)(2)(E) was not based upon considerations unique to criminal actions. We therefore conclude that the judicial gloss *James* imposed upon Rule 801(d)(2)(E) should apply in civil actions as well as criminal. We do note, however, that the district court's discretion in controlling the order of proof may be broader where a party seeks to introduce coconspirators' statements in a civil action rather than a criminal proceeding since the concern of avoiding any possible prejudice to a party from the admission of evidence later determined to be inadmissible is not as strong in the civil context. Otherwise we do not attempt to delineate the scope of that discretion on this appeal.

At trial the district court allowed Newton to introduce the coconspirator's statements after he had instructed the jury that it should consider the coconspirator's statements as evidence only if it found by evidence independent of the statement that Pressman was a member of the conspiracy. Since the district court granted a directed verdict to Pressman at the close of the presentation of evidence by the parties, none of the factual findings upon which the admissibility of the statements depend were ever made. The evidence presented did not establish as a matter of law the existence of a conspiracy of which Pressman was a member. The initial determination whether the coconspirator's statements are admissible should be made by the district court, pursuant to the dictates of *James*, when the action is retried.

On this appeal Pressman questions whether Newton satisfied the requirement of Rule 801(d)(2)(E) that the statements have been made by a coconspirator of a "party." Pressman contends that none of the evidence presented by Newton showed any connection between it and the alleged conspiracy. Without deciding whether this particular requirement of Rule 801(d)(2)(E) was satisfied, we would note that Pressman is a corporate entity and Bader, the alleged member of the conspiracy, was its employee. One often repeated tenet of corporate law is that a corporation can act only through its directors, officers, and employees, and that the acts of a corporate officer or employee may be attributed to the corporation. *See e.g., New York Central & Hudson River Railroad v. United States,* 212 U.S. 481, 29 S.Ct. 304, 53 L.Ed. 613 (1909); *Rochez Brothers v. Rhoades,* 527 F.2d at 884; *Nelson Radio & Supply Co. v. Motorola, Inc.,* 200 F.2d 911, 914 (5th Cir. 1952), *cert. denied,* 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953). If Bader was a member of the conspiracy and if his actions are attributable to Pressman, then the requisite connection between Pressman and the conspiracy would exist. Resolution of this issue, however, will depend upon factual findings concerning, *inter alia,* whether Bader acted in the course and scope of his employment. In the absence of any such findings by the trier of fact below, we decline to reach the issue but leave it to be determined upon retrial.

## V. Due Diligence

Pressman asserts that the directed verdict should be upheld on the ground that Newton failed to show that it had acted with "due diligence," which this court held to be an element of a private cause of action based upon a violation of Rule 10b–5 in *Dupuy v. Dupuy,* 551 F.2d 1005 (5th Cir.), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). Pressman contends the evidence reflects that prior to the stock transactions underlying this suit Newton had dealt with out–of–town customers solely on a cash basis. Yet it engaged in transactions in Imperial stock totalling almost one million dollars in a period of one month on a "payment–against–delivery" basis, which required it to purchase the stock with its own funds and then seek payment from

its customers. Although the customers to whom Newton extended this form of credit were New York residents with whom it had not dealt previously, Newton made no attempt, Pressman argues, to check the background or credit of these customers until after the fraud had been consummated. Even after Newton learned of the criminal background of one of those customers, it continued to deal with them in the hope of recouping its money.

Newton responds that it met the standard of diligence established by the court in *Dupuy*. It asserts that it presented evidence showing that its employee who dealt with the out–of–town customers met one of them personally before accepting purchase orders from him, that one of the purchasers had been highly recommended to Newton by a good customer, and that its employee checked the bank accounts of two of the customers.

■ In *Dupuy v. Dupuy*, 551 F.2d 1005 (5th Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977), this court delineated the nature of the showing that must be made by a plaintiff asserting a Rule 10b–5 claim to establish that he justifiably relied upon the fraudulent activities of the defendant. This showing is a precondition to recovery and is frequently characterized as a requirement that the plaintiff show he acted with due diligence. *See also Clement A. Evans & Co. v. McAlpine*, 434 F.2d 100 (5th Cir. 1970), *cert. denied*, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971). Noting that "scienter" must be shown before liability will be imposed upon a defendant charged with violating Rule 10b–5, the court in *Dupuy* held that the standard of

care imposed upon a 10b–5 plaintiff by the due diligence requirement should not be more exacting than the corresponding standard imposed upon the defendant. Thus the court concluded that the plaintiff should not be barred from recovering under Rule 10b–5 where he merely acts negligently. Rather, at a minimum, he must have acted recklessly to have acted without due diligence. *Dupuy v. Dupuy*, 551 F.2d at 1020.[6] The evidence presented by the parties presents a sufficiently close factual question concerning whether Newton acted with due diligence to prevent us from deciding the issue as a matter of law under the rule of *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (en banc).

## VI. Conclusion

We reverse the grant of a directed verdict to Pressman on the grounds that the common law principles of agency are applicable in actions brought under federal securities laws and that Pressman failed to establish as a matter of law the good faith defense available to it under § 20(a). On the present record neither party is entitled to prevail as a matter of law on the issues (1) whether Bader acted within the scope and course of his employment while engaging in the allegedly fraudulent practices, (2) whether the statements made by Bader's alleged coconspirators were admissible against Pressman, and (3) whether Newton acted with "due diligence." The resolution of these issues must await the retrial of the action.

**REVERSED and REMANDED.**

---

**6.** Pressman asserts that the court in *Dupuy* adopted a sliding scale approach in determining the degree of care required of a plaintiff by the due diligence requirement. Under such an analysis, the standard of care imposed upon the plaintiff varies according to the degree of culpability that must be shown to impose liability upon the defendant. Since Pressman's liability under the respondeat superior doctrine or under § 20(a) would not depend upon a showing that it acted with scienter, it argues that a more stringent standard of care than the recklessness standard utilized in *Dupuy* should be imposed upon Newton. To recover from Press-

man under the Securities Exchange Act for the actions of its employee, Bader, however, Newton must show under either theory that Bader violated the Act, which requires it to demonstrate that Bader acted with scienter. *See Cameron v. Outdoor Resorts of America, Inc.*, 611 F.2d 105, 106–07 (5th Cir. 1980) (on rehearing). Because Pressman's liability will depend in part upon a showing by Newton that Bader acted with scienter, the court's conclusion in *Dupuy* that no greater standard of care than recklessness should be required of the plaintiff under the due diligence requirement remains valid.

TJOFLAT, Circuit Judge, concurring specially:

I concur in all of the majority opinion except Part IV; several serious considerations compel my dissent to that remaining portion of the opinion.

The majority extends to civil actions the rule that this circuit established, sitting en banc, in the criminal case of *United States v. James*, 590 F.2d 575 (5th Cir.), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). *James*, we said, presented an "appropriate opportunity ... to establish a new standard and procedure for handling the admissibility of co–conspirator statements *in criminal conspiracy trials.*" *James*, 590 F.2d at 578 (emphasis added). Admittedly, the logic the *James* court employed could be made to apply to all statements susceptible to a hearsay objection. *James*, 590 F.2d at 593 (Tjoflat, J., concurring specially). Nevertheless, the issue in *James* was specifically framed in terms of the circumstances that criminal conspiracy trials present. This factor, coupled with the significance of the holding, mandates a narrow, precise reading of the case's precedential value. Extension of the *James* rule to civil actions, based solely on the authority of *James*, is an inappropriately broad application of the case. Proper resolution of hearsay questions in civil actions, therefore, should turn upon application of the federal rules of evidence, without the alterations effected by the judicial "gloss" of *James*.

Moreover, I feel it necessary to reiterate my belief that *James* effectuated a judicial re–write of the Federal Rules of Evidence. Substantive alteration of federal rules is not within the purview of this court; extension of such judicial re–writing to situations distinct from that which gave rise to the initial transgression simply exacerbates the offense. *See James*, 590 F.2d at 584–594 (Tjoflat, J., concurring specially).