Paul E. STANTON, Jr., Pano A. Lamis and David Rosenthal as trustees of Atlanta Vascular Specialists, P.C. Profit Sharing Plan and Atlanta Vascular Specialists, P.C. Money Purchase Pension Plan for the Use and the Benefit of Dr. Paul E. Stanton, Jr., Plaintiffs,

v.

SHEARSON LEHMAN/AMERICAN EXPRESS, INC. (formerly known as Shearson/American Express, Inc.) and Peg J. Shimp, Defendants.

Civ. A. No. C84–1731A.

United States District Court,
N.D. Georgia,
Atlanta Division.

Feb. 28, 1986.

On Motion for Reconsideration
April 3, 1986.

See also, D.C., 622 F.Supp. 293.

---

**7.** See FN 4, *supra.*

Gerald B. Kline, Bauer, Deitch & Raines, Atlanta, Ga., for plaintiffs.

Peter J. Anderson, Peterson, Young, Self & Asselin, Atlanta, Ga., for defendants.

## ORDER

ROBERT H. HALL, District Judge.

Presently pending is plaintiffs' motion for partial summary judgment on their claim that defendants violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq..* Specifically, plaintiffs seek a ruling that defendants, while acting as ERISA fiduciaries with respect to plaintiffs' retirement plans, breached their fiduciary duties to plaintiffs and are liable to plaintiffs for their breach.

**FACTS**

The undisputed facts relevant to the motion before the court are as follows:

1. Atlanta Vascular Specialists, P.C. a Georgia corporation, maintains two retirement funds for the benefit of plaintiff Stanton. One fund is known as the Atlanta Vascular Specialists, P.C. Profit Sharing Plan and the other as the Atlanta Vascular Specialists, P.C. Money Purchase Pension Plan. These plans are trusts organized under the laws of the State of Georgia and plaintiffs Stanton, Lamis and Rosenthal are the named trustees. (Complaint ¶ 1).

2. By early 1982, plaintiff Stanton decided to "self-direct" his share of the plans, or, in other words, to make the investment decisions regarding his funds independent of the other physicians' funds. (Shimp Deposition, pp. 120–22).

3. In March of 1982, the plaintiff trustees on behalf of both the Pension Plan and the Profit Plan opened two securities trading accounts with defendant Shearson Lehman/American Express, Inc. ("Shearson"), through its registered representative, de-

fendant Peg J. Shimp. The total initial portfolio in both accounts was approximately $103,000.00.

4. These accounts were opened as non-discretionary accounts. (Shimp Deposition, p. 156; Exhibits 15 and 19 to Shimp Deposition). The initial intent of both Stanton and Shimp was that Stanton would play an active role in the investment decisions regarding his funds and be responsible for them. (Shimp Deposition, p. 155–57; Stanton Deposition, p. 25).

5. Between January, 1982, and January, 1983, defendant Shimp effected 223 trades on behalf of the profit plan account. (Exhibit 1 to second Kline Affidavit). Of these trades, 221 trades, or 99%, were made pursuant to instructions from plaintiff Stanton which were prompted by specific, unsolicited recommendations made by defendant Shimp. (Id.; Shimp Deposition, pp. 88–89).

6. Between January, 1983, and January, 1984, defendant Shimp effected 484 trades on behalf of both the pension plan account and the profit plan account. (Exhibit 6 to Shimp Deposition). Of these trades, at least 436 trades, or 90%, were made pursuant to instructions from plaintiff Stanton which were prompted by specific, unsolicited recommendations made by defendant Shimp. (Id; Shimp Deposition, pp. 88–89).

7. In 1983, plaintiff Stanton independently requested defendant Shimp to buy a particular stock five or six times. (Shimp Deposition, pp. 196, 222–23).

8. Defendants received a commission for defendant Shimp's services. Defendants earned commissions exceeding $87,000.00 in the calendar year 1983.

## DISCUSSION

### A. *Fiduciary status*

The first question presented by plaintiffs' motion for partial summary judgment

is whether the defendants were ERISA fiduciaries with respect to plaintiffs' retirement plans.

Under ERISA, which defendants concede applies to this action, there are three ways to acquire fiduciary status—by being named in a plan as a fiduciary, by being named as a fiduciary pursuant to the procedures specified in a plan, or by performing "fiduciary" functions. *See* 29 U.S.C. §§ 1002(21)(A) and 1102(a)(1). In the instant action, plaintiffs submit that defendants acquired fiduciary status the last way, that is, by virtue of their performance of "fiduciary" functions.[1] Thus, the court must examine 29 U.S.C. § 1002(21)(A), the statutory provision which identifies the functions deemed "fiduciary". That section provides, in pertinent part, that:

a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan....

29 U.S.C. § 1002(21)(A).

As there is no question that neither defendant Shimp nor defendant Shearson had any discretionary authority or discretionary responsibility in the administration or management of plaintiffs' retirement plans,[2] the question before the court is whether it is beyond dispute that either or both of the defendants exercised any au-

1. In plaintiffs' most recent brief, plaintiffs attempt to argue (belatedly) that defendant Shearson acquired fiduciary status by being identified as a fiduciary by Stanton. Because there is no evidence introduced of such an identification, the court rejects this argument summarily.

2. In their most recent brief, plaintiffs attempt to argue (again, belatedly) that defendant Shear-

son had responsibility in the *administration* of the retirement plans. However, the court finds that the evidence shows that Shearson's involvement concerned only the investment of the ERISA assets, not the administration of the plans themselves, and, thus, that plaintiffs' argument is not viable; the court will not consider it further.

thority or control respecting the management or disposition of the assets of the two plans or rendered, or had authority or responsibility to render, investment advice for a fee with respect to the assets of the plans. Plaintiffs argue that there is no genuine dispute that defendants did both (exercised control and rendered investment advice for a fee), while defendants argue that there are fact questions surrounding their functions.

### (1) *The stock broker (defendant Shimp)*

#### (a) *Authority or control over the management or disposition of assets*

Plaintiffs argue that in 1982 and 1983 defendant Shimp, in effect, exercised authority or control over the disposition of Stanton's plan assets within the meaning of 29 U.S.C. § 1002(21)(A) because 99% of the transactions which she executed in 1982 and at least 90% of the transactions which she executed in 1983 were the direct result of her specific, unsolicited recommendations to him, recommendations which he blindly followed since he was dependent upon her special expertise.

Defendants oppose plaintiffs' argument on essentially two grounds. At one point they seem to contend that whenever a broker executes transactions on behalf of an ERISA plan pursuant to instructions from a plan fiduciary which specify limits on the trading, that broker does not acquire fiduciary status, notwithstanding the fact that the instructions may have been based solely on the broker's specific, unsolicited recommendations. Most of their opposition, however, rests on the contention that there exists a fact question as to whether Stanton blindly followed his broker's recommendations or exercised independent judgment in instructing Shimp.

■ While the court disagrees with defendants' legal proposition, it agrees that there is a genuine dispute as to whether defendant Shimp acquired fiduciary status by exercising de facto control over Stanton's ERISA assets. Accordingly, the court DENIES summary judgment for plaintiffs on this point.

■ The question of law posed by the pending motion—whether a stock broker exercises "any authority or control respecting management or disposition of [ERISA plan] assets" when he or she executes transactions on behalf of an ERISA plan pursuant to instructions which were based on his or her specific, unsolicited recommendations where the client is dependent upon and relies on the broker's special expertise—is one of first impression which the court answers in the affirmative. Even though a client may have the final word on how his or her assets will be traded and is, thus, technically in control of the assets, it is the stock broker who is *effectively* and *realistically* in control of the assets when, for whatever reason, the client merely "rubber stamps"—follows automatically or without consideration—the investment recommendations of the broker *Cf. Arceneaux v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 767 F.2d 1498, 1502 (11th Cir.1985) (in a securities churning action, a stock broker can exercise control over trading if the client is intimidated by his broker and reluctant to make suggestions or contradict any suggestions made by the broker).

The regulations promulgated under ERISA do not mandate a different conclusion, contrary to what defendants maintain. The regulations provide, in pertinent part, that:

A person who is a broker or dealer registered under the Securities and Exchange Act of 1934 ... shall not be deemed a fiduciary, within the meaning of section [1002](21)(A) of [ERISA], with respect to an employee benefit plan *solely because such person executes transactions for the purchase or sale of securities* on behalf of such plan in the ordinary course of its business as a broker [or] dealer ... pursuant to instructions of a fiduciary with respect to such plan, if: (i) Neither the fiduciary nor any affiliate of such fiduciary is such broker [or] dealer ...; and (ii) The instructions specify (A) the security to be purchased or

sold, (B) a price range within which such security is to be purchased or sold, ... (C) a time span during which such security may be purchased or sold (not to exceed five business days), and (D) the minimum or maximum quantity of such security which may be purchased or sold within such price range....

29 C.F.R. § 2510.3–21(d)(1) (Emphasis added). The regulations address the mere execution of securities transactions pursuant to a client's particularized instructions; providing specific, unsolicited investment advice to a dependent client goes far beyond this limited involvement.

Turning to the question of whether there is a fact question surrounding plaintiff Stanton's dependence on his broker, the court, as indicated previously, finds that defendants have produced sufficient evidence to create such a fact question for trial. Admittedly, plaintiffs' evidence, especially certain portions of defendant Shimp's deposition testimony, strongly supports their position that defendant Shimp was "pretty much authorized ... to do what she thought was best in the accounts," (Stanton Deposition, p. 47), but the court declines to enter summary judgment for plaintiffs on this issue given evidence in the record that Stanton had some knowledge and experience in securities trading (for example, he occasionally discussed with Shimp ideas he had from reading financial journals or talking with others and he solicited five or six trades); the jury will have to decide the extent to which Stanton relied on defendant Shimp.

### (b) *Investment advice for a fee*

Whether or not defendant Shimp acquired fiduciary status because of rendering investment advice is also a fact question for the jury. There is a fact question as to whether defendant Shimp rendered investment advice within the meaning of 29 U.S.C. § 1002(21)(A)(ii) [3] and, if so, whether she collected a fee for her advice.

### (2) *The employer brokerage firm (defendant Shearson)*

With regard to defendant Shearson, defendant Shimp's employer, plaintiff makes two distinct arguments as to how this defendant acquired fiduciary status under ERISA. First, they contend that if defendant Shimp is determined to have acquired fiduciary status by virtue of performing fiduciary functions, her status must be imputed to Shearson because Shearson has responsibility for its employee's acts. Second, plaintiffs essentially argue that Shearson acquired fiduciary status directly by exercising control over a broker who was charged with executing transactions on behalf of an ERISA account (thereby exercising "authority or control respecting the ... disposition of [ERISA] assets"), or, alternatively, by rendering investment advice for a fee or other compensation.

Defendants challenge plaintiffs' first argument on the ground that a brokerage firm should not be deemed a fiduciary, and thus subjected to ERISA liability, just because of its employee's fiduciary status, especially when it was not at fault. Defendants do not address plaintiffs' second argument.

■ Confronted once again with a question of first impression, the court, in its best judgment, concludes that a brokerage firm such as Shearson should be subject to ERISA liability *both* on a respondeat superior theory as well as on a "direct" fiduciary theory.

*Respondeat superior.* While there is nothing in the Act itself or the legislative history of ERISA which specifically addresses a brokerage firm's respondeat superior liability for the acts of a broker who acquires fiduciary status by virtue of his or her fiduciary functions, the court finds that the broad protective purpose of ERISA calls for such liability. Applying common law agency principles in ERISA actions would further Congress's intent to protect retirement plans from self-dealing, impru-

---

**3.** See 29 C.F.R. § 2510.3–21(c)(1) for the defini-   tion of "rendering investment advice."

dent investing and misappropriation of plan funds.

A brokerage firm is generally initially chosen based upon its reputation and prestige rather than upon the reputation and prestige of the individual employee with whom the client might deal; such firms should be held accountable if the employees they select utilize the firm's prestige to take advantage of or imprudently invest ERISA funds.[4]

■ Accordingly, the court concludes that the fiduciary status (and thus acts) of a brokerage firm's agent can be "imputed" to the brokerage firm under a respondeat superior theory for purposes of determining ERISA liability. Of course, the question of whether defendant Shearson acquired fiduciary status under this theory depends on whether the jury finds that defendant Shimp acquired fiduciary status and, if so, whether she acted within the scope of her employment when she engaged in the acts which made her an ERISA fiduciary. For this reason, the court DENIES summary judgment for plaintiffs on Shearson's "imputed" status.

*Direct fiduciary status.* In order for Shearson to be a fiduciary independent of defendant Shimp's acts, and independently subject to fiduciary or co-fiduciary liability, Shearson must qualify as an ERISA fiduciary within the meaning of that term.

■ The court, again attempting to effectuate the broad protective purpose of ERISA, concludes that a brokerage firm retained to handle ERISA funds exercises "authority or control respecting the management or disposition of [ERISA] assets" when it exercises authority or control over the broker assigned to the ERISA account; since the broker's employment respects the disposition of ERISA assets,

control over the broker is control respecting the disposition of those assets.

The court realizes that this ruling means that every brokerage firm retained to handle ERISA funds automatically becomes an ERISA fiduciary but concludes that it is reasonable to require such firms to exercise due care in the training and supervision of employees assigned to ERISA accounts to guard against unauthorized acts by those employees which constitute ERISA breaches. This rule will provide an incentive for brokerage firms to actively investigate and supervise the activities of their brokers.

With this ruling, the court must hold, in turn, that defendant Shearson acquired fiduciary status under ERISA as a matter of law by virtue of its control over defendant Shimp and GRANTS partial summary judgment for plaintiffs accordingly.

As for plaintiffs' argument that defendant Shearson acquired fiduciary status by rendering investment advice for a fee or other compensation, the court concludes that to the extent Shearson rendered such advice, it was through defendant Shimp and any fiduciary status arising from her actions would be imputed, not direct.

### B. *Breach of fiduciary duties*

The court turns next to the question of whether there is any genuine dispute that defendant Shearson, independent of defendant Shimp's actions, breached its fiduciary duties under ERISA. (Since it is not yet established whether defendant Shimp is a fiduciary under ERISA, the court directs this section to only defendant Shearson and, further, only to defendant Shearson's supervisory activities.)

The court finds it cannot rule on this question because plaintiffs have not adequately addressed it in their briefs. (Plaintiffs have thus far concentrated on the

---

**4.** Applying the doctrine of respondeat superior to the ERISA context is consistent with this circuit's rule under the securities laws. *See Paul F. Newton & Co. v. Texas Commerce Bank,* 630 F.2d 1111, 1118–19 (5th Cir.1980). Contrary to what defendants contend, the rule in this circuit is that common law agency principles,

including the doctrine of respondeat superior, remain viable in actions brought under the Securities Exchange Act of 1934 and the Securities Act of 1933 and provide a means of imposing secondary liability for violations of those acts independent of the "controlling persons" provisions of those acts. *Id.*

activities of defendant Shimp, touching only briefly on the supervisory activities of defendant Shearson.) The court DENIES plaintiffs' summary judgment on this point.

## CONCLUSION

The court:

(1) GRANTS partial summary judgment for plaintiffs on the issue of whether defendant Shearson directly acquired fiduciary status under ERISA, finding that it did; and

(2) DENIES the rest of plaintiffs' motion for partial summary judgment.

## ON MOTION FOR RECONSIDERATION

In its Order of February 28, 1986, this court granted partial summary judgment for plaintiffs on the narrow issue of whether defendant Shearson acquired fiduciary status under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, merely by virtue of its control over a broker charged with executing transactions on behalf of an ERISA account. The court, in answering this question in the affirmative, effectively concluded that a brokerage firm retained to handle ERISA funds automatically becomes an ERISA fiduciary pursuant to 29 U.S.C. § 1002(21)(A)(i). Presently pending is defendants' motion for reconsideration of this ruling.

The court GRANTS defendants' motion but, upon reconsideration, DECLINES TO VACATE the above ruling. Notwithstanding case law to the contrary, *see, e.g., Robbins v. First American Bank of Virginia,* 514 F.Supp. 1183, 1189–91 (N.D.Ill.1981) (bank which only performed ministerial functions held not to have acquired fiduciary status under ERISA even though employees' employment respected the disposition of ERISA assets), the court finds its interpretation of 29 U.S.C. § 1002(2)(A)(i) warranted by the broad protective purpose of ERISA. Absent a fiduciary duty to use due care in training and supervising brokers assigned to ERISA cases, brokerage firms could escape ERISA liability for actions taken by a broker outside the scope of the broker's employment simply by not

diligently guarding against such unauthorized acts.

For clarity the court notes that it has not adopted a rule of strict liability. The brokerage firm will not be "directly" liable under ERISA unless it fails to train and supervise its broker with the care, skill, prudence and diligence that a prudent brokerage firm would exercise, 29 U.S.C. § 1104(a)(1), and such failure causes a loss to an ERISA plan. 29 U.S.C. § 1109. *See also* 29 U.S.C. § 1105(a). Thus, if a brokerage firm is reasonably diligent in training and supervising brokers assigned to ERISA accounts, it will not be liable under ERISA.