SUCCESSOR TRUST COMMITTEE OF PERMIAN DISTRIBUTING, INC. EMPLOYEES' PROFIT SHARING PLAN AND TRUST on behalf of its Participants

v.

FIRST STATE BANK, ODESSA, N.A., Jerry Hallmark, Jimmy Brown, Dan Mosley, David Lyons, Luther Snell and Rick Browning.

PERMIAN TANK & MANUFACTURING, INC., and the Advisory Committee of the Permian Tank & Manufacturing, Inc. Profit Sharing Plan and Trust

v.

FIRST STATE BANK, ODESSA, N.A. and the Federal Deposit Insurance Corporation.

Jack MANNING, C. Jack Manning, Bob D. Manning, Bob D. Manning, Judith Creech, Rodney Holley, Barney Irvin, Donald Kirby, Refugio Lopez, Valrey Marler, David McCullum, James McGehee, William Olive, Benny Shelton, Edward Shepard, M.D. Wilkerson, and Wesley Wilkerson

v.

FIRST STATE BANK, ODESSA, N.A., and the Federal Deposit Insurance Corporation.

Nos. MO–89–CA–04, MO–89–CA–53 and MO–89–CA–82.

United States District Court, W.D. Texas, Midland–Odessa Division.

Feb. 15, 1990.

As corrected Feb. 23, 1990 and April 5, 1990.

William C. Gaston, Stubbeman, McRae, Sealy, Laughlin & Browder, Inc., Midland, Tex., for plaintiffs.

Richard K. Nunley, Odessa, Tex., William H. Bruckner, and Robin E. Selzer, Bruckner & Sykes, Houston, Tex., Randall L. Rouse, Shafer, Davis, McCollum, Ashley, O'Leary & Stoker, Ken Griffin, Odessa, Tex., for consolidated plaintiffs.

Stewart McKeehan, Browning & McKeehan, Odessa, Tex., Pete Baker, and William Franklin Baker, Glandon, Erwin, Scarborough, Baker & Choate, Abilene, Tex., Robert E. Hoblit, Federal Deposit Ins. Corp., Midland, Tex., for defendants and consolidated defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BUNTON, Chief Judge.

BEFORE THIS COURT came to be heard the above-numbered, consolidated actions for trial to the Bench. Plaintiffs filed their respective actions pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Having heard the testimony adduced by the witnesses and having considered the evidence submitted by the parties, this Court is of the opinion that the parties should be commended for their organization, cooperation and efficient presentation at trial. The issues at bar are relatively novel and the fact patterns complex, yet the entire consolidated matter was tried within a day and a half, without prodding by the Court. After such a smooth and efficient production, this Court regrets that both sides cannot come forth victorious. The Court is firmly convinced, however, that despite an adverse ruling against some of the parties herein, ultimately the parties, the public and Uncle Sam reaped a tremendous benefit from the efforts of counsel. With that, the Court now enters its Findings of Fact and Conclusions of Law.

## BACKGROUND

The three cases before the Court had their origin on September 30, 1983, the date the Comptroller of the Currency declared the National Bank of Odessa ("NBO") insolvent. On that same date, the Federal Deposit Insurance Corporation, in its Receiver Capacity (the "FDIC–R"), was appointed Receiver of the failed bank. On October 1, 1983, the FDIC–R entered into a Purchase and Assumption Agreement with Independent Bankshares, Inc. ("IBI") as the holding corporation for First State Bank Odessa ("FSBO"), selling the assets of NBO to IBI/FSBO. Contemporaneously thereto, the Federal Deposit Insurance Corporation in its Corporate Capacity (the "FDIC–C") entered into an Indemnity Agreement with FSBO, indemnifying FSBO for any action resulting from any directions of the FDIC–R or the FDIC–C.

Among the documents of the former NBO Trust Department, FSBO found five assets at issue this day which included:

1. The Foster Note. During the period that NBO acted as trustee for the Permian Tank & Manufacturing, Inc. Employees' Profit Sharing Plan and Trust (the "PTM Plan") and Rock Tool Company's Employee Profit Sharing Plan (the "Rock Tool Plan"), NBO purchased for the PTM Plan a 32% ownership interest in the $297,500.00 Foster promissory note secured by a deed of trust on real estate in Midland, Texas. NBO also purchased for the Rock Tool Plan a 16.8% participation interest in the Foster Note. FSBO took over the Foster Note on October 1, 1983.

2. The Haner–Dennis Note. During the period that NBO acted as trustee for the Permian Distributing, Inc. Employee's Profit Sharing Plan and Trust (the "PDI Plan") and for the Rock Tool Plan, NBO entered into a Real Estate Lien Note with Haner and Dennis Investments. The PDI Plan and the Rock Tool Plan each participated in 10% of the Note, which is secured by a Deed of Trust on property in Odessa, Texas. FSBO took over the Haner–Dennis Note on October 1, 1983.

3. The Wendy's Restaurant Property. During the period that NBO acted as trustee for the Rock Tool Plan and the PDI Plan, NBO bought real property in Odessa, Texas and built a Wendy's Restaurant thereon. The land and building were then leased to Westwind Operations, Inc. doing business as Wendy's Restaurant. The Rock Tool Plan owned an undivided 12.5% interest in the property and the PDI Plan owned an undivided 25% interest in the property. FSBO took over the Wendy's Property on October 1, 1983.

4. The Global Marine Stock. During the period that NBO acted as trustee for the Rock Tool Plan, NBO purchased 100 shares of Global Marine, Inc. common stock to be placed in the Rock Tool Plan trust portfolio. FSBO took over the Global Marine Stock on October 1, 1983.

5. The Rowe Note. During the period that NBO acted as trustee for the PDI Plan, NBO purchased for the PDI Plan a 16.67% participating interest in the Rowe Promissory Note which was secured by a Deed of Trust on real property in Odessa, Texas. FSBO took over the Rowe Note on October 1, 1983.

### FINDINGS OF FACT

1. The parties properly brought these consolidated actions before this Court under a Federal statute, namely ERISA, 29 U.S.C. § 1001 *et seq.*

2. The PDI, Rock Tool and PTM Plans are employee pension benefit plans as that term is defined in 29 U.S.C. § 1002(2). The Plaintiffs herein are "employers" or "employees" as those terms are defined in 29 U.S.C. §§ 1002(5), (6).

3. The portion of the Purchase and Assumption Agreement between IBI and the FDIC relevant to the Trust Assets is found in Section 17, which states:

17.1 *Assumption of Trust Duties.* The trust business of the Bank [NBO] shall be transferred to the Assuming Bank effective as of the Bank Closing and the Assuming Bank shall, without further transfer, substitution, act, or deed, to the fullest extent permitted by law, succeed to the rights, obligations, properties, assets, investments, deposits, agreements, and trusts of the Bank under all trusts, executorships, administrations, guardianships, agencies, under all other fiduciary or representative capacities to the same extent as though the Assuming Bank had originally assumed the same, and the Assuming Bank shall, to the fullest extent permitted by law, succeed to and shall be entitled to take and execute the appointment to all executorships, trusteeships, guardianships, and other fiduciary or representative capacities to which the Bank is or may be named in wills, whenever probated, or to which the Bank is or may be named or appointed by any other instrument.

FSBO's Exhibit 2.

4. The operative language of the Indemnity Agreement between the FDIC–R and FSBO, executed on September 30, 1983, is as follows:

SECTION 2. INDEMNIFICATION OF ASSUMING BANK

The Corporation will indemnify and hold the Indemnitees harmless from and against the following:

(4) Any and all claims whatsoever based upon any action or inaction of the Bank, its directors, officers, or agents as fiduciary, agent, or custodian prior to the Bank Closing (as defined in the agreement) arising from the failure of the Assuming Bank to seek to recover any damages from the Bank or the Receiver for such action or inaction; ...

(5) Any and all claims whatsoever not covered by clauses (1), (2), (3), and

(4) above and (a) based upon any action or inaction by the Bank, its directors, officers, or agents prior to the Bank Closing....

SECTION 3. PAYMENTS ON CLAIMS

The Indemnitees shall use their best efforts to keep the Corporation informed as to all material claims described in clauses (1), (2), (3), (4), (5), and (6) of Section 2 hereof and shall make no payments thereon or settlement in respect thereof unless so directed in writing by the Corporation. Additionally, the Corporation shall not be obligated to reimburse any such person for any expenses incurred in responding to any such claim unless such expense were incurred at the written discretion of the Corporation.

Plaintiffs' Exhibit 2 at pp. 3, 5.

5. In March of 1984, Dan Mosley, Manager of FSBO's Trust Department from March of 1984 to May of 1987, was made aware of several assets involving prohibited transactions under ERISA, namely notes and other assets evincing self-dealing between NBO and NBO Company (the Trust Department of NBO).[1] Included among the offending transactions was the Foster Note, the Haner–Dennis Note, the Rowe Note, the Wendy's Property and the Global Marine Common Stock. Mosley informed the FDIC of these problems as early as April of 1984. Plaintiffs' Exhibit 7.

6. After the Trust Department of FSBO discovered the prohibited transactions, numerous letters, meetings and other forms of communication took place between the FDIC, FSBO and Independent Bankshares, Inc. ("IBI," the parent and holding company of FSBO) with regard to manner with which these transactions should be dealt. At issue were the breaches of fiduciary duty by NBO prior to FSBO's acquisition of the Notes. By letter dated June 25, 1984 Brad Stephens, President of Independent Bankshares, Inc. informed the FDIC that IBI sought indemnification under the Purchase and Assumption Agreement and Indemnity Agreement between FSBO and the FDIC–R. Plaintiffs' Exhibit 10.[2]

7. By letter dated February 10, 1984, and again by letter dated August 14, 1984, the FDIC informed FSBO that it did not intend to repurchase the PTM loans (including the Foster Note). Plaintiffs' Exhibit 11. In a Trust Committee meeting of March 20, 1984, FSBO recorded its understanding that the FDIC would not buy back the prohibited loans because FSBO was the successor fiduciary. FSBO's Exhibit 130. Further, by letter dated June 12, 1986, the FDIC informed FSBO of its position that:

Unless and until a determination is made to repurchase the assets, First State Bank [FSBO] is totally responsible for the administration of these assets. You do not have to seek our approval for decisions required to administer the accounts. We assume you will administer the accounts in a professional manner in keeping with your fiduciary responsibilities.

Plaintiffs' Exhibit 17. This position was reiterated specifically regarding the Foster Note by letter dated February 9, 1987. Plaintiffs' Exhibit 22.

8. Despite the aforementioned letters, it is apparent to this Court that negotiations with regard to the disposition of the prohibited transactions between FSBO and the FDIC were ongoing, with the FDIC baiting FSBO with promises of compromise or other settlement. See, e.g.: FSBO's Exhibit 37, FSBO's Exhibit 131. Different FDIC officers, at different times led FSBO to believe that the FDIC was in fact going to repurchase those transactions found to be in violation of trust laws and ERISA. Five years elapsed in which the negotiations re-

---

1. According to Mosley, FSBO knew about the prohibited transactions as of the date of takeover, October 1, 1983. Evidence presented at trial shows that the Trust Committee of FSBO suggested a detailed examination of "possible problems of loans in employee benefit plans" following the January 6, 1984 Trust Committee Meeting. FSBO's Exhibit 130.

2. It has come to the attention of the Court that the typed date on Plaintiffs' Exhibit 10 is actually June 25, 984. The Court notes that although this Court had not yet been established in the year 984, it is highly likely that Pope Lucius sat upon the Catholic Bench and would have ruled similarly to this Court on the relevance of Plaintiffs' Exhibit 10.

garding a buy back were ongoing between the FDIC and FSBO before FSBO began taking actions on its own to remedy the situation.

9. As further evidence of the FDIC's ambiguous attitude towards responsibility for the prohibited transactions, the FDIC wrote FSBO on March 26, 1987 stating that

The FDIC's position is, and has always been, that (1) FSB[O], not the FDIC, is responsible for administration of the trust assets acquired from NBO; and (2) FSB[O] is not required to seek FDIC approval for decisions regarding the administration of trust assets.

The FDIC's position is consistent with the Indemnity Agreement executed by the FDIC and FSB[O] on September 30, 1983. Section 2 of that Agreement provides in part that:

"... except as expressly provided in this Indemnity Agreement, the Corporation [FDIC] shall not be liable to the Indemnitees [FSBO] for any action or inaction on the part of the Indemnitees [FSB] after the Bank [NBO] Closing." The only exception to this language is found in Section 3 of the Indemnity Agreement....

FSBO's Exhibit 82.

10. On May 6, 1985, the Fosters declared bankruptcy and no longer made payments on their Note. Prior to their declaration of bankruptcy, however, the Fosters became past due on their note payments on November 1, 1983. Dan Mosley testified that had it not been for the relationship between FSBO and the FDIC, FSBO would have foreclosed upon the property securing the Foster Note at that time. Instead, FSBO delayed foreclosure upon the real estate collateral until May 6, 1987, with permission of the Bankruptcy Court, at which time, it sold one of the five parcels of land constitution the collateral securing the Foster Note.[3] Net proceeds from the sale of the 0.366 acre tract, part of the real estate securing the Foster Note, totalled $24,300.43. On August 11, 1987, the automatic stay order was lifted by the Bankruptcy Court under an agreement by Douglas Moore of FSBO in which FSBO waived all rights to a deficiency judgment against the Fosters. The Fosters subsequently amended their bankruptcy plan for reorganization which proposed payments to unsecured creditors. The amended plan was confirmed by Order of the Bankruptcy Court on December 9, 1987. On October 6, 1987, FSBO caused a non-judicial foreclosure sale of the remaining four out of five tracts to be conducted under the Foster Deed of Trust, and purchased the property at the sale for $413,068.48. FSBO took title to this property as "FSBO, successor-in-interest to NBO." FSBO sold the remaining collateral securing the Foster Note for net sales proceeds of $77,701.73 and, as of November 30, 1989 continued to hold possession of all of the funds received from the sales and the rents collected.

11. The Rowe Note was a performing asset as of October 1, 1983 but defaulted on April 1, 1985. Although the Trust Committee of FSBO had the authority to foreclose upon the Rowe Note, such action was not taken until April 5, 1988. PDI was not given notice of the sale. FSBO purchased the property for $40,000.00 as "FSBO, Trustee, and its successors." The foreclosed collateral securing the Rowe Note was subsequently sold by FSBO in November, 1988 for $30,000.00. PDI was not notified of the sale and FSBO kept PDI's share of the proceeds until September 5, 1989, at which time PDI received $4,433.22.

12. Between April 1984 and May of 1987, the Wendy property lease was a performing asset, despite its prohibited status and despite the fact that the franchisee did not pay real estate taxes on the property from 1987 onward. Rental payments ceased after January 1, 1989, however. On May 2, 1989, FSBO, as trustee of the Wendy's lease, sold the Wendy's property to

---

**3.** Appraisals on the five tracts that made up the property over the years show the declining value of the property. In December of 1982, the tracts had a total appraised value of $374,000.00. Plaintiffs' Exhibit 52. In April of 1985, the appraised value of the tracts was $200,000.00. Plaintiffs' Exhibit 53. The appraised value of the tracts as of August 27, 1987 was $34,000.00. Plaintiffs' Exhibit 58.

714

Eddie Boykin for a gross amount of $170,-000.00 ($152,542.16 net). Neither the PDI nor the Rock Tool Plans were informed of the sale. Of the $17,457.84 of expenses in the sale of the Wendy's property, $10,-200.00 went to Trower realtors. The owner of Trower realtors, Virgil Trower, had been on the FSBO Board of Directors since July 19, 1985 and had been a member of the FSBO Trust Committee since February 1989.

13. The Haner–Dennis Note matured in June of 1986, but was not paid. It was neither renewed or extended by FSBO. Thereafter, FSBO made no effort to foreclose on the collateral or recoup a deficiency until April 5, 1988. At that time, FSBO bought the real estate for $245,000.00, taking title to the property as "FSBO, Trustee, and its successors." Notice of the sale was never given to the PDI Plan or to the Rock Tool Plan. FSBO leased the property from April 6, 1988 through December 31, 1988. Neither the PDI Plan nor the Rock Tool Plan received any proceeds from the lease or sale of the property.

14. The Global Marine Stock, although not a prohibited transaction under ERISA, was a violation of trust policies at the time of its acquisition. Dan Mosley testified that the stock could have been sold over the phone on any working day. Instead of such sale, however, FSBO held on to the stock and it gradually deteriorated in value until it was practically worthless. In January, 1986, Global Marine, Inc. filed for protection from creditors under Chapter 11 of the U.S. Bankruptcy Code. Pursuant to the Global Marine, Inc. bankruptcy reorganization the stock was surrendered to the exchange agent for new stock of .10 par value per share. Additionally, warrants to purchase additional stock were issued.

15. During the period in which FSBO held the assets at issue, FSBO charged Rock Tool Company a semi-annual Trustee's fee. Plaintiffs' Exhibits 35 and 38. At trial, Dan Mosley conceded that FSBO acted in a fiduciary capacity to the Rock Tool Company Plan as FSBO had discretion to invest plan monies and to dispose of assets in the Plan. Although biannual

statements of assets in the Rock Tool Plan were sent to Mr. Manning, et al., the Court notes that such statements were highly misleading as each asset showed an "estimated annual income" on the Foster and Haner–Dennis Notes, the Global Marine Stock and the Wendy's Lease through September 30, 1987. Plaintiffs' Exhibits 34, 36, 37, 39, 41–44, 46–49. The numbers on the printouts were explained away by Dan Mosley as a "quirk in the software." Regardless of the state of the software, the printouts did not inform the Plaintiffs of the true state of the assets and therefore did not constitute notice that the aforementioned notes, lease and stock involved prohibited transactions.

16. No other evidence was produced at trial which convinced this Court that effective notice was sent to the PTM or PDI Plans that prohibited transactions existed regarding the aforementioned notes, lease and stock.

CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter of this suit pursuant to 28 U.S.C. § 1331.

2. ERISA defines a fiduciary as one who (a) exercises any discretionary authority or discretionary control respecting management of an ERISA plan or exercises any authority or control respecting management or disposition of its assets, (b) renders advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of an ERISA plan, or has authority or responsibility to do so, or (c) has any discretionary authority or discretionary responsibility in the administration of such plan. 29 U.S.C. § 1002(21)(A).

3. Under ERISA there are three ways to acquire fiduciary status: (a) by being named as a fiduciary; (b) by being named as a fiduciary pursuant to the procedures specified in a plan; or (c) by performing "fiduciary" functions. *See:* 29 U.S.C. § 1102(a)(1); *Stanton v. Shearson Lehman/American Express, Inc.*, 631 F.Supp. 100 (N.D.Ga.1986).

▆ 4. A liberal construction of the term "fiduciary" comports with the broad, remedial purpose of ERISA and this Court finds that such a construction is proper. *Donovan v. Mercer*, 747 F.2d 304, 309 (5th Cir.1984); *American Federation of Unions Local 102 Health & Welfare Fund v. Equitable Life Assurance Society of the United States*, 841 F.2d 658 (5th Cir.1988). A person is a fiduciary only with respect to those portions of a plan over which he exercises discretionary authority or control. *Sommers Drug Stores Company Employees Profit Sharing Trust v. Corrigan Enterprises, Inc.*, 793 F.2d 1456, 1459–60 (5th Cir.1986), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837 (1987).

▆ 5. Courts have consistently found trustees of an ERISA plan or of plan assets, by the very nature of their positions, to be fiduciaries as that term is defined under ERISA. *Secretary of Department of Labor v. King*, 775 F.2d 666 (6th Cir. 1985) (successor trustee of ERISA plan qualified as a fiduciary); *Czyz v. General Pension Board, Bethlehem Steel Corporation*, 578 F.Supp. 126 (D.C.Pa.1983); *Donovan v. Daugherty*, 550 F.Supp. 390 (S.D. Ala.1982); *Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629 (W.D.Wis.1979).

▆ 6. This Court finds as a matter of law that FSBO acted as a fiduciary in administering the transactions at issue. FSBO charged the Rock Tool Company trustee's fees for its administration of the various assets it held for the Rock Tool Plan. After October 1, 1983, FSBO had the authority to sell the notes/property/stock in issue, foreclose upon any collateral securing the assets, receive rental payments after foreclosure, recoup a deficiency judgment, etc. For these reasons, the Court finds that FSBO had the authority to exercise discretion over the transactions and therefore falls within the ambit of "fiduciary" for purposes of ERISA. 29 U.S.C. §§ 1002(21)(A), 1102(a)(1).

▆ 7. ERISA imposes a prudent man standard of care upon fiduciaries with respect to an employee benefit plan. 29 U.S.C. § 1104(a)(1). The Fifth Circuit articulated that § 1104 imposes a duty of loyalty and a duty of care upon fiduciaries. *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1260 (5th Cir.1980); *Donovan v. Cunningham*, 716 F.2d 1455 (5th Cir.1983), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984). Further, the legislative history of ERISA indicates an intention on the part of Congress to incorporate the "core principles of fiduciary conduct" found in the common law of trusts into the ERISA fiduciary definition. *Donovan, supra. See also: Fink v. National Savings and Trust Co.*, 772 F.2d 951 (D.C.Cir.1985). A Court's task in evaluating fiduciary compliance with the standard is to inquire "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir.1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169. If the Court finds the actions of the fiduciary to be arbitrary and capricious, a finding of liability under § 1109(a) is appropriate. *Czyz v. General Pension Board, Bethlehem Steel Corp.*, 578 F.Supp. 126 (D.C.Pa.1983).

▆ 8. In reviewing the evidence submitted by the parties at trial, this Court is of the opinion that FSBO's actions in failing to liquidate or otherwise dispose of the prohibited transactions, failing to seek foreclosure upon the collateral of non-performing assets, and allowing assets to decrease steadily in value without action constitutes a breach of FSBO's fiduciary duty for the reason that FSBO acted arbitrarily and capriciously in regard to the administration of those assets. In defense of their actions, FSBO brought forth a multitude of evidence that it repeatedly contacted the FDIC in an attempt to clarify the FDIC's position regarding the prohibited transactions vis à vis the Indemnity Agreement. As set out above, the FDIC's various responses and communiques were at best ambiguous. Of central import to this Court, however, was the language of the Purchase and Assumption Agreement specifically setting out FSBO's duties as a successor trustee to the assets of the failed

NBO's trust department. That language, along with the minutes of the Trust Committee dated March 20, 1984, gives this Court no reason to doubt that FSBO understood that the FDIC considered FSBO a fiduciary in terms of the assets. Whether or not FSBO agreed with the FDIC's position is of no relevance, as this Court finds that FSBO was on notice as of at least March 20, 1984 that the prohibited transactions must be dealt with promptly and prudently in the best interests of the Rock Tool, PDI and PTM Plans. Further, state of mind does not determine fiduciary status under ERISA. *Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629 (W.D.Wis.1979). Although the Court does not fault FSBO for pursuing a workout with the FDIC, such actions should have been undertaken contemporaneously with any other actions to administer the assets to the benefit of the aforementioned plans. In light of the above discussion, it is the finding of this Court that FSBO acted arbitrarily and capriciously in its fiduciary status as trustee of the prohibited transactions.

9. In making its finding on liability against FSBO, the Court expressly limits FSBO's liability to any losses that occurred subsequent to FSBO's acquisition of the assets, on October 1, 1983. Public policy established in the seminal case of *D'Oench, Duhme & Co., Inc. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), which protects the FDIC from numerous, if not most, defenses has been extended to provide holder in due course status to the FDIC for assets it assumes from failed banks. *In the Matter of CTS Truss, Inc. v. FDIC*, 868 F.2d 146, 150 (5th Cir.1989); *Federal Savings & Loan Insurance v. Murray*, 853 F.2d 1251 (5th Cir.1988). As this Court held in *First National Bank of Andrews v. FDIC*, 707 F.Supp. 265 (January 17, 1989 Memorandum Opinion on Cross Motions for Summary Judgment), to hold the successor who takes in good faith

from a fully shielded party accountable for liabilities once extinguished is an absurd result. Thus, it is the finding of this Court that neither the FDIC nor FSBO shall be accountable for the wrongdoing of NBO prior to FDIC's takeover of the failed bank.

10. The next issue this Court shall address is whether the FDIC, by its Indemnity Agreement with FSBO, contractually agreed to indemnify FSBO for the liabilities which FSBO incurred after October 1, 1983. This Court holds that it did not. As quoted in the Findings of Fact above, both the Purchase and Assumption Agreement and the Indemnity Agreement clearly contemplate Indemnity for wrongdoing prior to the FDIC's takeover of NBO or claims that FSBO had against NBO. This Court does not find, within the four corners of the Indemnity Agreement, a provision indemnifying FSBO for wrongdoing FSBO committed after it took over the trust assets as is required under current Texas law. *See: Ethyl Corporation v. Daniel Construction Co.*, 725 S.W.2d 705 (Tex. 1987).

11. FSBO also claims that it relied on the various communications it had with agents of the FDIC regarding the FDIC's willingness to buy back or otherwise liquidate the prohibited transactions. This Court is of the opinion that, as a matter of law, such claim is barred by the Federal Tort Claims Act, specifically the discretionary function exception found therein.[4] 28 U.S.C. § 2680(a). The seminal Supreme Court case interpreting the discretionary function exception is *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) wherein the Court opined:

the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing

---

**4.** The discretionary function exception provides: The provisions of the [Federal Tort Claims Act] shall not apply to—(a) any claim based upon an act or omission of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved was abused.

plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out operations of government in accordance with official directions cannot be actionable.

346 U.S. at 35–36, 73 S.Ct. at 968 (footnotes omitted). The Fifth Circuit expanded the scope of *Dalehite* when it wrote: "If the Tort Claims Act is to have the corpuscular vitality to cover anything more than automobile accidents in which government officials were driving, the federal courts must reject an absolutist interpretation of *Dalehite....*" *Smith v. United States,* 375 F.2d 243, 246 (5th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967). Factors useful in determining when the acts of a Government employee are protected from tort liability include (1) the nature and quality of the conduct, and (2) "whatever else the discretionary function exception may include, it plainly was intended to encompass discretionary acts of the Government acting in its role as regulator of the conduct of private individuals...." *United States v. Varig Airlines,* 467 U.S. 797, 808, 104 S.Ct. 2755, 2762, 81 L.Ed.2d 660 (1984).

Recent Fifth Circuit authority tends to support this Court's position that FSBO's counterclaims against the FDIC are barred by the Federal Tort Claims Act. *See, e.g.: Williamson v. U.S. Department of Agriculture,* 815 F.2d 368 (5th Cir.1987) (acts of different Farmers Home Administration officials involving the granting, administration of, and denial of various loans falls within the discretionary function exception to the Federal Tort Claims Act); *Gordon v. Lykes Brothers Steamship Co.,* 835 F.2d 96 (5th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 73, 102 L.Ed.2d 50 (1988) (lack of due care in promulgating a policy, or in having no policy or program at all on an issue, however imprudent it may seem, is encompassed within the discretionary function exception).

■ In the case at bar, the discretionary function involved was the opinions or affirmations of various FDIC employees at various times with regard to whether or not and how the FDIC should deal with the prohibited transactions which acted as thorns in the side of FSBO. This Court finds as a matter of law that the FDIC employees were acting in conjunction with the discretionary authority vested in them by the FDIC. As such, the FDIC cannot be held liable to FSBO for any reliance FSBO placed upon the opinions or findings parlayed at various times to members of FSBO's Trust Committee.

12. Finally, this Court must address the issue of whether or not to hold liable individual Defendants Jerry Hallmark, Jimmy Brown, Dan Mosley, David Lyons, Luther Snell, and Rick Browning for collective transgressions of FSBO. Each of these individual Defendants were members of the FSBO Trust Committee at some point in time between January 1984 and the present and were sued in their individual capacities by the PDI Plaintiffs.

■ It is the rule of the Fifth Circuit that common law agency principles apply to actions brought under the Securities Exchange Act of 1934 and the Securities Act of 1933. *Paul F. Newton & Co. v. Texas Commerce Bank,* 630 F.2d 1111, 1118–9 (5th Cir.1980). This rule has been extended to include actions brought under ERISA. *Stanton v. Shearson Lehman/American Express, Inc.,* 631 F.Supp. 100 (N.D.Ga.1986). This Court finds, from the evidence presented by the parties, that each of the FSBO Trust Committee members named above acted at all times in their capacity as a Trust Committee member. No evidence was presented tending to show that any of the members acted outside the scope of his authority. Further, it is evident that each action or omission was approved of by FSBO. For this reason, the Court is of the opinion that to impose liability upon the individual Trust Committee members would be to impose double liability, as the actions of the individuals were taken in the capacity of an agent for FSBO. Therefore, this Court is not inclined to find liability against the individual trust Committee members.

13. Plaintiffs presented evidence of the damages suffered by FSBO's breach of its fiduciary duties via testimony of James Williams, a financial and economic consultant. According to Mr. Williams, the present value of each of the ERISA plans, had the prohibited transactions been liquidated by May 1, 1984 and reinvested in conservative, low-risk investments, would be as follows:

a) The PTM Plan: calculated on three different bases:

(1) original loan balance with NBO of $94,142.10: $183,780.10;

(2) 1985 appraisal of property at $65,600.00: $113,252.04; and

(3) fictitious appraisal of property at $60,000.00: $99,405.83.

b) The PDI Plan: $202,894.53

c) The Rock Tool Plan: $203,763.84

Plaintiffs' Exhibits 84–87.

14. These figures were then compared with the actual present value of the Plans to arrive at the following loss figures [5]:

a) The PTM Plan: $113,252.04 − (−23,-299.75) = $136,551.79.

b) The PDI Plan: $202,894.53 − (−32,-294.18) = $235,188.71.

c) The Rock Tool Plan: $203,763.84 − (−6,614.06) = $210,377.90.

The Court is of the opinion that, in line with § 1109 of ERISA, FSBO should "Make good ... any losses to the plan[s] resulting from each ... breach, and to restore to such plan[s] any profits of such which have been made through use of assets of the plan by the fiduciary...." 29 U.S.C. § 1109(a). Therefore, the Court is of the opinion that each Plan shall recover the present value of its losses as stated above. The Court finds the 1985 appraisal of the collateral securing the Foster Note as the relevant basis for figuring the PTM Plan's losses. Further, the Court shall allow recovery by the Manning Plaintiffs of those amounts of trustee's fees paid by

Rock Tool Company to FSBO which were proved at trial. Accordingly,

IT IS ORDERED that the PDI Plaintiffs (case no. MO–89–CA–04) shall recover from FSBO the amount of $235,188.71 in damages. Post Judgment interest at the rate of 7.74% per annum shall accrue on that sum from this date until the date the Judgment is paid.

IT IS FURTHER ORDERED that the PTM Plaintiffs (case no. MO–89–CA–53) shall recover from FSBO the amount of $136,551.79 plus post-judgment interest at the rate of 7.74% from this date until the date the Judgment is paid.

IT IS FURTHER ORDERED that the Manning Plaintiffs (case no. MO–89–CA–82) shall recover from FSBO the amount of $210,377.90 (representing losses on the plan assets) plus $1,688.85 (representing proven trustee's fees paid to FSBO by the Manning Plan) for a total of $212,066.75. Post-judgment interest in the amount of 7.74% shall accrue on the total amount from this date until the date the Judgment is paid.

IT IS FURTHER ORDERED that the PDI Plaintiffs shall take nothing by their suit against Defendants Jerry Hallmark, Jimmy Brown, Dan Mosley, David Lyons, Luther Snell, and Rick Browning.

IT IS FURTHER ORDERED that the Manning Plaintiffs and the PTM Plaintiffs shall take nothing by their suits against the FDIC.

IT IS FURTHER ORDERED that FSBO shall take nothing by its counterclaims against the FDIC.

IT IS FINALLY ORDERED that costs of Court shall be assessed against FSBO.

A separate Judgment shall be issued this day. Attorney's fees shall be awarded to each of the Plaintiff groups on the basis of affidavits submitted by each party's counsel. Affidavits shall address each of the

5. The Court accepts Mr. Williams' loss calculation based on the 1985 valuation of the Foster collateral at $65,000.00 (32% of $200,000.00) for the reason that the Fosters defaulted on the Note as of November 1, 1983. Taking into consideration attempts at renegotiation, the closest date at which a valuation of the collateral property was made was April 10, 1985. For that reason, the Court shall use the calculation based upon $65,000.00 for purposes of calculating damages.

factors set out by the Fifth Circuit in *Johnson v. Georgia Highways Express, Inc.*, 488 F.2d 714 (5th Cir.1974).

Let execution lie if not timely paid.

## JUDGMENT

BEFORE THIS COURT came the parties for trial on Plaintiffs' suit under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.* For reasons set out in the Court's Findings of Fact and Conclusions of Law, the Court finds that Plaintiffs shall recover damages on their claims against First State Bank, Odessa. The Court further finds that the PDI Plaintiffs (case no. MO–89–CA–04) shall take nothing by their suit against Jerry Hallmark, Jimmy Brown, Dan Mosley, David Lyons, Luther Snell and Rick Browning. The Court finally finds that First State Bank, Odessa shall take nothing by its counterclaims against the Federal Deposit Insurance Corporation. Accordingly, Judgment shall issue for the Plaintiffs with costs assessed against First State Bank, Odessa.

IT IS THEREFORE ORDERED that the PDI Plaintiffs (case no. MO–89–CA–04) shall recover from FSBO the amount of $235,188.71 in damages. Post Judgment interest at the rate of 7.74% per annum shall accrue on that sum from this date until the date the Judgment is paid.

IT IS FURTHER ORDERED that the PTM Plaintiffs (case no. MO–89–CA–53) shall recover from FSBO the amount of $136,551.79 plus post-judgment interest at the rate of 7.74% from this date until the date the Judgment is paid.

IT IS FURTHER ORDERED that the Manning Plaintiffs (case no. MO–89–CA–82) shall recover from FSBO the amount of $210,377.90 (representing losses on the plan assets) plus $1,688.85 (representing proven trustee's fees paid to FSBO by the Manning Plan) for a total of $212,066.75. Post-judgment interest in the amount of 7.74% shall accrue on the total amount from this date until the date the Judgment is paid.

IT IS FURTHER ORDERED that the PDI Plaintiffs shall take nothing by their suit against Defendants Jerry Hallmark, Jimmy Brown, Dan Mosley, David Lyons, Luther Snell, and Rick Browning.

IT IS FURTHER ORDERED that the Manning Plaintiffs and the PTM Plaintiffs shall take nothing by their suits against the FDIC.

IT IS FURTHER ORDERED that FSBO shall take nothing by its counterclaims against the FDIC.

IT IS FINALLY ORDERED that costs of Court shall be assessed against FSBO.

Let execution lie if not timely paid.